WICKER, Judge.
The plaintiff, Erick Jackson, appeals a summary judgment rendered in favor of the defendants, Louisiana Power & Light (LP & L) and Ebasco Services, Inc. (EBAS-CO). He concurrently asks for the is *9 suance of a supervisory writ in connection with a denial of his own motion for summary judgment on the same issue: whether these defendants were Jackson’s statutory employers, limiting his recovery to workmen’s compensation. We affirm in part, reverse in part and remand.
Plaintiff argues that neither Ebasco nor LP & L are statutory employers under the definition of that term:
1. Ebasco was only an agent or middleman; and the relevant contract was between LP <& L and Nuclear Installation Services Co., Inc. (NISCO), Jackson’s employer;
2. LP & L, in contracting out the construction of the Waterford III nuclear plant, was not engaged in its regular trade, business, or occupation.
Defendants argue that both are statutory employers:
1. Ebasco, whether denominated as general contractor or as LP & L’s agent, was actually performing as general contractor on the construction of Waterford III;
2. Since the generation and transmission of power is the regular trade, business, and occupation of LP & L, the construction of a plant to generate such power is likewise part of LP & L’s regular trade, business, or occupation.
On November 23, 1982, Jackson was employed as a millwright/pipe-fitter by NIS-CO. NISCO’s contract with EBASCO and/or LP & L was for the construction of a nuclear steam supply system (NSSS). Jackson slipped and fell while climbing a ladder, injuring his back and leg. He has had two back surgeries and is seriously disabled, but he is receiving compensation from NISCO’s insurer.
Jackson sued LP & L, alleging its negligence in allowing oil to accumulate on the ladder and in failing to provide adequate lighting in the area. Later, Jackson added General Electric Company, manufacturer of the device from which the spilled oil allegedly originated; Employers National Insurance Company, the liability insurer; and EBASCO.
Extensive discovery by all parties took place, and several discovery motions were tried. Ebasco filed an exception of prescription, as yet unresolved. Jackson ultimately dismissed General Electric from the suit without prejudice.
EBASCO and LP & L filed motions for summary judgment, alleging their exemption from liability in tort. In response, Jackson filed a cross motion. The trial court had before it the contracts among LP & L, EBASCO, and NISCO; the depositions and affidavits of LP & L and EBASCO employees and officers; and LP & L’s corporate charter.
EBASCO’s and LP & L’s motions were granted, and Jackson’s was denied. The trial judge held that the issue in question, whether or not LP & L and EBASCO were statutory employers, had been resolved contrary to the injured employee in the case of Brown v. Ebasco Services, Inc., 461 So.2d 443 (La.App. 6th Cir.1984).
The statute upon which LP & L and EBASCO rely to insulate them from tort liability is LSA-R.S. 23:1032 and 1061.
R.S. 23:1032, in part:
The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury, or compensable sickness or disease. For purposes of this Section, the word “principal” shall be defined as any person who undertakes to execute any work which is a part of his trade, business or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof.
R.S. 23:1061, in part:
Where any person (in this section referred to as principal) undertakes to exe *10 cute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed.
TORT LIABILITY OF EBASCO
With regard to ÉBASCO’s tort liability, we hold that the trial judge was correct in his reasons for summary judgment:
Ebasco, a general contractor, builds power plants for utility companies. It provides engineering, design and construction of power plants. It provides labor and/or contracts for its provision. Accordingly, the general contractor, Ebasco, was the statutory employer of plaintiff and was building a power plant for LP & L.
The evidence at trial of the motion for summary judgment consisted of the deposition and affidavit of James M. Brooks, construction manager for EBASCO at the Waterford III site; the affidavit of James Cain, President and Chief Executive Officer of LP & L; the deposition of Frederick J. Drummond, nuclear services manager for LP & L; and the contracts among LP & L, EBASCO, and NISCO.
According to Brooks, EBASCO had built approximately twelve (12) nuclear power plants. At the Waterford III site, EBAS-CO performed all the functions of a general contractor; and in its contract with LP & L, it undertook to construct part of the Waterford III plant. The contract in question reads: “Ebasco Services, Inc. submits to Louisiana Power & Light Company the following contract for the furnishing of professional engineering, construction management and related services_” Brooks approximated that EBASCO had between two hundred (200) and two hundred and fifty (250) crafts people and four hundred (400) non-manual people in supervision, engineering, management, and quality assurance on the Waterford III site. Although EBASCO subcontracted much of the work, it had the option to do all the work itself under its contract with LP & L.
Brooks’ affidavit affirms that Ebasco Services is in the trade, business and occupation of providing major engineering and construction services for utility companies across the United States, including the design and construction of major power facilities, and has been in this same trade, business and occupation for approximately the last 80 years.
According to Drummond, LP & L looked to EBASCO to build Waterford III.
The contract between LP & L and EBAS-CO provides, in pertinent part, the following obligations of EBASCO:
II. SERVICES TO BE PERFORMED BY EBASCO
The professional engineering, design, nuclear licensing, estimating, scheduling, purchasing, traffic, materials engineering, vendor quality compliance, expediting and construction management services to be furnished by EBASCO for the Project, under the direction of a Project Manager, will consist of those set forth in this Article.
[[Image here]]
B. —“FORCE ACCOUNT” CONSTRUCTION SERVICES BY EBASCO It is understood and agreed that during the performance of construction management services described in Article II, subsections C-l and C-2 of this Contract, LP & L shall have the right to elect that EBASCO undertake construction of the *11 Project or portions thereof on a force account basis, including organizing and assembling the construction forces and equipment in addition to performing services on a construction management basis.
LP & L is obligated, under its contract with EBASCO, to provide personnel only “to test and start up the Project and conduct initial operations....”
The contract also provides, with respect to the parties’ respective insurance obligations, that LP & L is to furnish public liability and property damage coverage, while EBASCO is to furnish workmen’s compensation, employers’ liability, public liability and property damage, and contractors’ public liability and property damage, among others. EBASCO also agrees
to the extent that it is covered by insurance, fully to indemnify and save harmless LP & L ... from and against all claims and legal actions, and all expenses and attorneys’ fees incidental to the defense of any such claims or actions, and to pay any judgments rendered against LP & L and/or EBASCO, for injuries (including death) to any person whomsoever or damages to any property whatsoever resulting from or arising out of the services performed under the Contract or caused by or sustained in connection with the Contract, even for the sole negligence of LP & L.
“The plea of ‘statutory employer’ under the provisions of section 1061 is an affirmative defense and the burden of proof is on the party asserting it....” Berry v. Holston Well Service, Inc., 488 So.2d 934, 939 (La.1986). EBASCO has met its burden of proving that it was the “statutory employer” of Jackson. The evidence shows overwhelmingly that, at the time of Jackson’s injury, EBASCO undertook “to execute any work which is a part of his [its] trade, business or occupation in which he [it] was engaged at the time of the injury, or which he [it] had contracted to perform_” LSA-R.S. 23:1032.
Previous cases involving EBASCO’s claim to be a statutory employer have reached the same result. King v. Ebasco Services, Inc., 488 So.2d 1293 (La.App. 5th Cir.1986); Borne v. Ebasco Services, Inc., 482 So.2d 40 (La.App. 5th Cir.1986); Brown v. Ebasco Services, Inc., 461 So.2d 443 (La.App. 5th Cir.1984), writ granted in part 462 So.2d 1235 (La.1984). All three cases involve EBASCO’s role in the construction of the Waterford III plant. We approve these cases and affirm the trial judge’s grant of EBASCO’s motion for summary judgment.
TORT LIABILITY OF LP & L
With regard to LP & L’s status as a statutory employer, however, we reach a different result.
Previous decisions on similar facts might have supported a determination that LP & L was Jackson’s statutory employer because the construction of nuclear power plants was “a part of his [its] trade, business or occupation.” However, the Supreme Court case of Berry v. Holston Well Service, Inc., supra, has set clear guidelines for the resolution of this matter in Jackson’s favor.
Drummond testified that LP & L had some involvement in two nuclear facilities: Waterford III and one additional that was cancelled. He added that no other power plants of any kind had been undertaken by LP & L since 1975, and that there were no other plants being planned at the time of his deposition, August 28, 1986. It was common practice for most utility companies to contract with outside companies for the construction of nuclear plants, and even those companies with the capability of doing it themselves generally “end[ed] up getting outside contractors later on.” Specifically, LP & L has never used its own employees to install a nuclear steam supply system and to perform related work. Drummond further testified that, at the time of his deposition, LP & L did not have the capacity to install a nuclear steam supply system and reactor coolant pump motors. In order to build Waterford III itself, LP & L would have had to hire people to do the job. It was LP & L’s “first time — nuclear plant, so we didn’t have the in-house nuclear experience as we had when you related it back to a gas-fired facility.”
*12 On the other hand, LP & L does have the authority, under its corporate charter, according to Drummond and the affidavit of Cain, to construct, build, install and equip power plants. However, having the authority to do so is not the same as having the capacity to do so.
Berry v. Holston Well Service, Inc., supra, was factually similar to the instant case. Sohio Natural Resources Company owned and operated an oil well. It contracted with Holston to furnish the necessary rig, equipment and personnel for drilling. Holston then contracted with the plaintiff’s direct employer for the performance of certain specialized work, and the plaintiff was injured while doing that work. Sohio raised the statutory employer defense. In denying Sohio’s motion for summary judgment, the Supreme Court reversed two separate decisions of the Third Circuit Court of Appeal on this issue. The jurisprudential and legislative history of this issue is clearly set forth in the opinion.
STATUTORY EMPLOYMENT DOCTRINE3
Pursuant to section 1061, employees of contractors are under certain circumstances considered to be the employees of the owner or principal. Lewis, supra. As originally enacted the purpose behind this fiction of the law was to prevent principals from evading their compensation responsibilities by interposing a “straw man” between them and those “employees” who are doing the whole or a part of their trade, business or occupation. Rowe, supra (Lemmon, J. concurring); Lewis, supra; 1C A. Larson, The Law of Workmen’s Compensation, § 49.-00 (1982); 13 W. Malone & H. Johnson, La.Civil Law Treatise — Worker’s Compensation, § 121 (1980). Although its purpose was self-evident, beginning with the case of Thibodaux v. Sun Oil Co., 218 La. 453, 49 So.2d 852 (1950), this Court developed the doctrine of tort immunity for principals (i.e. statutory employers) vis-a-vis their contractor’s employees (i.e. statutory employees).
This jurisprudential doctrine was later codified in 1976 when the legislature amended certain sections of the Act. See 1976 La.Acts, No. 147, § 1; Rowe, supra (Lemmon, J. concurring). Since the time of Thibodaux and through the present, most of the cases involving a claim by the injured employee against the principal were cases sounding in tort, and in most instances the employee had already received compensation from his immediate employer. Malone & Johnson, supra, § 126. In this context, courts have struggled to determine what is or is not a statutory employment relationship. The primary reason advanced for the difficulty was the fact that section 1061 was “being interpreted in a context for which it was never intended” (i.e. How should the question of a principal’s tort liability or immunity therefrom vis-a-vis an employee of a contractor be resolved?). Id. “The section [1061] makes no indication that this subject was intended to be resolved by its provisions, and until the jurisprudence established the principal’s tort immunity, no one would have concluded that it should be so used.” Id.
Initially, the courts of this state, including this Court, had determined that a contractor was performing a part of the principal’s trade, business or occupation, and thus falling under the statute, when the contract work was an integral and/or essential part (or other synonyms) of the trade, business or occupation of the principal. See for example Barnes v. Sun Oil Co., 362 So.2d 761 (La.1978); Thibodaux, supra; Melancon v. Tassin Amphibious Equip. Corp., 427 So.2d 932 (La.App. 4th Cir.), writ denied 433 So.2d 166 (La.1983); Klohn v. Louisiana Power & Light Co., 394 So.2d 636 (La.App. 1st Cir.1980), writ denied 399 So.2d 612 (La.1981); Stelly v. Waggoner Estates, 355 So.2d 12 (La.App. 1st Cir.1977), writ denied 356 So.2d 1011 La.1978); Vizena v. Travelers Ins. Co., 238 So.2d 238 (La.App. 3d Cir.), writ denied 256 La. 885, 239 So.2d 542 (1970); Shird v. Maricle, 156 So.2d 476 (La.App. 3d Cir.1963); Mau v. Industrial Steel Products Co., Inc., 119 So.2d 654 (La.App. 2d Cir.1960); *13 Stansbury v. Magnolia Petroleum Co., 91 So.2d 917 (La.App. 1st Cir.1957). This almost limitless standard yielded inconsistent and often illogical results since almost everything could be said to be integrally related to the principal’s trade, business or occupation. See Slocum v. Lamartiniere, 369 So.2d 201 (La.App. 3d Cir.), writ denied 372 So.2d 569 (La.1979) (New construction of a building was found to be within the trade, business or occupation of a grocery.); Foster v. Western Electric Co., Inc., 258 So.2d 153 (La.App. 2d Cir.1972) (Operating a cafeteria on the premises of a large industrial plant fell under the statute.).
Beginning with the case of Benson and followed by the cases of Lewis and Rowe, it is obvious that this Court has shifted its interpretive analysis regarding the statutory employer defense from one which favored a liberal application of the doctrine to one which is more restrictive. Rowe, supra (Lemmon, J. concurring). In so doing we have abandoned the “integral relation” test for a test that we feel is more in line with the purpose of sections 1032 and 1061. See Boudreaux v. Exxon Co., U.S.A., 441 So.2d 79 (La.App. 3d Cir.1983), writ granted and case remanded 445 So.2d 429 (La.1984), on remand 451 So.2d 85 (La.App. 3d Cir.), writ denied 458 So.2d 119 (La.1984). The reason for the change was that the former test was being interpreted too expansively, see Malone & Johnson, supra, § 126, thus transforming a doctrine which was originally designed to provide secondary protection to an injured employee into one which grants immunity to principals regardless of whether they actually pay compensation. 1 A. Larson, Workmen’s Compensation for Occupational Injuries and Death, § 49.11 (Desk ed. 1985). As a result, principals have been elevated to a more preferred position than an injured employee’s immediate employer in that the quid pro quo existing between the employee and his immediate employer (i.e. compensation regardless of fault for tort immunity) does not exist between the employee and the principal. La.R.S. 23:1032; 1061; contra 33 U.S.C. § 901 et seq. (Under the Longshoremen’s and Harbor Worker’s Compensation Act, in order for a principal to claim tort immunity it must have paid compensation benefits to the injured employee.). Although the shift is very clear, we have failed to succinctly set forth the method of analysis presently used by this Court in resolving the difficult question of statutory employment.
Berry v. Holston Well Service, Inc., supra at pp. 936-937. (Footnote omitted.) [The complete citations to Lewis, Rowe, and Benson are Lewis v. Exxon Corp., 441 So.2d 192 (La.1983); Rowe v. Northwestern National Ins. Co., 471 So.2d 226 (La.1985); and Benson v. Seagraves, 436 So.2d 525 (La.1983).]
The Court then set out guidelines for the determination of statutory employer status consisting of a three-level analysis:
(1) The primary focus should be on the scope of the contract work and whether it is specialized or non-specialized.
[C]ourts should consider whether the contract work requires a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field. If it is determined that the contract work is specialized per se, as a matter of law the work is not a part of the principal’s trade, business or occupation, and the principal is not the statutory employer of the specialized contractor’s employees. In this situation, “the purpose behind the rule is not violated and the reason for holding the principal directly liable in compensation exclusively does not come into play” because the contractor is an independent business enterprise, rather than a mere intermediary interposed to avoid compensation responsibility.
Berry v. Holston Well Service, Inc., supra, at p. 938. (Citations omitted.) (Emphasis by the Court.)
(2) The second level, reached if it is determined that the work in question is non-specialty, is to decide if the work being *14 contracted is part of the principal’s trade, business, or occupation.
Is the contract work routine and customary? That is, is it regular and predictable? Nonrecurring or extraordinary constructions and repairs usually are outside the scope of the statute. On the other hand, general maintenance and repair work, which by their very nature allow the smooth and continued operation of the principal, are within the scope of coverage. Lewis, supra; Benson, supra; Barnes, supra; Reeves v. Louisiana & Arkansas Railway Co., 282 So.2d 503 (La.1978).
Does the principal have the equipment and/or manpower capable of performing the contract work? This is a sub-species of the specialty inquiry, supra. Here the primary focus is on determining whether the contract work as relates to the principal is handled ordinarily through employees. Lewis, supra, citing 1C. A. Larson, The Law of Workmen’s Compensation, Sec. 49.12, at 9-41 (1982). What is the practice in the industry relative to contract work? Do industry participants normally contract out this type of work or do they have their own employees perform the work? See Reeves, supra; Brown v. Kaiser Aluminum and Chemical Corp., 289 So.2d 524 (La.App. 1st Cir.1973), writ not considered 293 So.2d 171 (La.1974); Malone & Johnson, supra, Sec. 126, pp. 252-53, fn. 91.
Berry v. Holston Well Service, Inc., supra at p. 938. (Emphasis by the Court.)
(3) Finally, the court must decide whether “the principal is engaged in the work at the time of the alleged accident.”
Berry v. Holston Well Service, Inc., supra, at p. 938.
In comparing the factual situation of LP & L in the instant case to the Berry guidelines, we find that LP & L has failed to meet its burden of proving statutory employer status. Specifically, we note that LP & L did not have the capacity to build a nuclear power plant with its own employees, that it was the practice in the industry for the construction of nuclear power plants to be contracted out, that LP & L had not built a power plant of any kind since 1975, that the construction of a nuclear power plant by LP & L was not a routine and customary activity, and that the work it contracted out to EBASCO and NISCO was specialty work.
We are aware that the Fourth Circuit, Gray v. Louisiana Power and Light Company, 247 So.2d 137 (1971), has held LP & L to be a statutory employer in circumstances where LP & L had contracted out the construction of concrete foundations for transmission towers. We find that case to be distinguishable on its facts and not persuasive.
We reverse the trial court’s determination that LP & L is a statutory employer of Jackson and therefore exempt from tort liability. We remand the case for further proceedings.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.