441 So.2d 192 (1983)
Vernon L. LEWIS
v.
EXXON CORPORATION and Robert D. Litt.
No. 82-C-2367.
Supreme Court of Louisiana.
May 23, 1983.
Rehearing Granted June 24, 1983.
On Rehearing November 28, 1983.
Concurring Opinion November 30, 1983.
Rehearing Denied January 6, 1984.
*193 Daniel L. Avant, John L. Avant, Avant & Falcon, Baton Rouge, for applicant.
Glen P. Marcel, Wendell G. Lindsay, Jr., Lindsay & Marcel, Baton Rouge, Robert H. Wood, Jr., Metairie, Louise V. White, New Orleans, for respondent.
WATSON, Justice.
In this tort suit by plaintiff, Vernon L. Lewis, the issue is whether Exxon proved its affirmative defense: that Lewis was performing work which was part of Exxon's trade, business or occupation. LSA-R.S. 23:1061.[1] *194 The trial court concluded that Exxon was the statutory employer of Lewis, resulting in tort immunity for Exxon and its employee, Robert D. Litt. LSA-R.S. 23:1032.[2] The court of appeal affirmed. Lewis v. Exxon Corp., 417 So.2d 1292 (La.App. 1 Cir.1982). A writ was granted to review the judgment, 422 So.2d 422 (La., 1982), which is affirmed.

FACTS
Exxon Corporation operates a chemical plant and refinery in Baton Rouge, Louisiana. Exxon employs nearly nine hundred people who are cross-trained to do construction and maintenance work, including four hundred and twenty to four hundred and thirty craftsmen. This number includes approximately twenty-seven welders and a hundred and thirteen pipefitters. In March of 1977, Exxon had about a hundred and twenty-six men assigned to construction work. Exxon's employees and contractors' employees are used interchangeably on Construction projects to maintain a steady level of Exxon employment. Although Exxon is capable of handling projects of any size, larger construction projects are generally performed by independent contractors. How much expansion or modification is done by Exxon employees and how much by others is an economic decision.
H.E. Wiese, Inc., had contracted to convert an inoperative Exxon ethanol (ethyl alcohol) unit to production of isopropanol (rubbing alcohol), thereby giving Exxon three isopropanol units. An incidental part of the contract, included as a matter of convenience, was installation of a metering device, an orifice run, on an eight inch gas line in one of the existing isopropanol units, unit number two. The device would have been installed regardless of whether the ethanol unit was converted to isopropanol. It was intended to measure the residual gas sent back to the refinery from all the isopropanol units. While Lewis, a pipefitter/welder employee of Wiese, was welding *195 an orifice flange on the eight inch gas line, a seal plug, intended to isolate that section of the line, blew out and he was injured. In March of 1977, the time of the accident, the gas line was not serving isopropanol unit number four, the one being converted, because unit four was not yet in operation.
Although this orifice run was intended to eventually unite the three isopropanol units, orifice devices were added almost daily at Exxon, and their installation was a routine practice for Exxon employees. There are "hundreds and hundreds" of orifice devices in the Exxon plant. (Tr. 1655)
Before Lewis started welding, Robert D. Litt, the Exxon section supervisor for isopropanol unit number two, issued a "hot work permit" (Tr. 677). There was evidence that use of the seal plug to block residual gas in the line was not a safe procedure. Exxon's safety standards warn that seal plugs have been known to blow out. Although employees of Exxon and Wiese jointly decided to use the seal plug, Litt had the final responsibility in the matter.
Exxon closed the ethanol plant because there was a low profit margin in ethanol and the ethanol unit did not meet current environmental standards. Subsequently, Exxon decided to convert the plant to the manufacture of isopropanol. The same basic process is used to manufacture ethanol and isopropanol. Building a completely new isopropanol unit would have cost about forty-two million dollars and the conversion from ethanol to isopropanol cost about sixteen million dollars. Normally, Exxon classifies capital improvements as construction work and expense items as maintenance. Seven million dollars of this conversion represented a capital expenditure: nine million dollars was carried on Exxon's books as current expenses for replacing old instruments with new ones. Thus, the conversion was primarily an expense or maintenance job. The contract between Wiese and Exxon had a lump sum price of $3,224,089, approximately a fifth of the total cost of the conversion. Additional personnel or time would have been needed to do the conversion project with Exxon employees, but Exxon had people qualified to do all the work that was done by Wiese.
At the conversion project's peak, approximately seventy pipefitters were employed; the job could have been completed with only twenty pipefitters in a longer space of time. It involved about a hundred thousand man hours and nine crafts, required a maximum of a hundred and seventy to a hundred and eighty people and lasted from August of 1976 until May of 1977.
Edward N. Boyle, Jr., head of project development at the Baton Rouge Exxon chemical plant, testified that his department was responsible for the isopropanol unit four plans. Twenty percent of the engineering drawings were made by Exxon and the balance by four contracting firms. All of the drawings could have been done by Boyle's office.
An Al-dox unit for the manufacture of cosmetic alcohols had been built by Exxon employees in 1961 at a cost of about five million dollars. Also, the Exxon ethanol north unit burned completely in May of 1970 and the twelve story structure was rebuilt by Exxon employees. Approximately ninety people, representing all crafts, worked on the very dangerous and complex reconstruction. The employees worked in two shifts, seven days a week, twelve hours a day, in this emergency situation.[3]
*196 Although it is not Exxon's custom to engage in major construction or major conversion projects with its own employees, the company has the capability and has done construction work when economically feasible.

LAW
When a principal engages a contractor to perform work which is a part of the principal's trade, business or occupation, the principal remains liable for compensation to any injured employee of the contractor. LSA-R.S. 23:1061, supra. When the work performed by the contractor is part of the principal's trade, business or occupation, workmen's compensation is the exclusive remedy of the contractor's injured employee. LSA-R.S. 23:1032, supra. A principal can be engaged in more than one business. Fonseca v. Marlin Marine Corp., 410 So.2d 674 (La., 1981); Slocum v. Lamartiniere, 369 So.2d 201 (La.App. 3 Cir.1979), writ denied 372 So.2d 569 (La., 1979); Doss v. American Ventures, Inc., 261 La. 920, 261 So.2d 615 (1972). In a tort suit by an injured employee of a contractor, the principal has the burden of proving that the work being performed was part of its trade, business or occupation. Reeves v. Louisiana & Arkansas Railway Co., 282 So.2d 503 (La., 1973). This factual issue turns on the particular circumstances of each case. Lushute v. Diesi, 354 So.2d 179 (La., 1977); Doss v. American Ventures, Inc., supra. Because the issue is factual, summary judgment is generally inappropriate. Thompson v. South Central Bell Tel. Co., 411 So.2d 26 (La., 1982); Quinn v. Progress Drilling, Inc., 401 So.2d 978 (La., 1981). Compare Barnes v. Sun Oil Company, 362 So.2d 761 (La., 1978). If the work being performed by the contractor's employee is customarily performed by employees of the principal, it is a part of the principal's trade, business, or occupation. Thompson, supra; Reeves, supra; Blanchard v. Engine & Gas Compressor Services, Inc., 613 F.2d 65 (5 Cir.1980).

CONCLUSION
This was primarily a renovation project rather than new construction: a minor portion of the total cost was new capital investment. Reeves, supra, held that Humble Oil & Refining Company was not the statutory employer of the plaintiff injured in that case. Reeves involved the construction of a new petroleum coking unit, a job for which Humble had neither the design capability nor the manpower. On the other hand, Exxon had the design capability and manpower to do the renovation involved here. Exxon had performed work of similar magnitude with its own employees, but generally contracted out large projects in order to keep a steady level of employment. Because Exxon did construction and renovation with its own employees, it was in the construction business. A principal can be engaged in more than one business, Doss, supra; Slocum, supra.
In this factual situation, the Exxon-Wiese contract as a whole is irrelevant. Lewis was not working on unit four, which was being converted to isopropanol production by Wiese. Lewis was installing an orifice flange on the premises of unit number two, which was intended to meter the gas residue from units two, three and, eventually, four. Installation of the orifice flange was an incidental and nonessential part of the entire contract. Since such installations were routinely made by Exxon's employees, the work being done by Lewis was customarily performed by Exxon's employees. Thus, as to Lewis, Exxon had the status of a statutory employer. LSA:R.S. 23:1061, 1032, supra.

DECREE
For the foregoing reasons, the judgment of the court of appeal is affirmed.
AFFIRMED.
CALOGERO, J., concurs.
*197 DENNIS, J., dissents and assigns reasons.
LEMMON, J., dissents and assigns reasons.
LEMMON, Justice, Dissenting.
In determining whether the principal "undertakes to execute any work, which is part of his trade, business or occupation", the court should focus on the overall scope of the work encompassed by the contract between the principal and the contractor. The majority has erred in this case by focusing its inquiry on the particular chore that the contractor's employee was performing at the time of the accident.
When the focus is on the relevant inquiry under the statute, Exxon in my opinion has failed to prove that the work Exxon contracted with Wiese to perform was regularly, customarily and routinely done by Exxon with its own employees as part of its trade, business or occupation. Reeves v. Louisiana and Arkansas Railway Company, 282 So.2d 503 (La.1973).

ON REHEARING
DIXON, Chief Justice.
This is a suit for damages by Vernon L. Lewis, an employee of H.E. Wiese, Inc., against Exxon Corporation. Exxon had employed Weise by contract to do certain work on the Exxon chemical plant in Baton Rouge. On original hearing, this court affirmed the decisions of the courts below, which held that Exxon was the statutory employer of the injured plaintiff. We granted a rehearing. We now reverse the earlier judgment of this court, and hold that Exxon was not the statutory employer of plaintiff. Plaintiff, therefore, is not limited to workers' compensation benefits, but may recover damages ex delicto.
In the absence of statutory provisions, an employee of a contractor would not be considered to be an employee of the owner or "principal." However, by statute, such an employee is deemed to be an employee of the principal when the contractor performs work for the principal in the principal's trade, business or occupation. R.S. 23:1061; Johnson v. Alexander, 419 So.2d 451, 454 (La.1982). A principal, for purposes of workers' compensation, is defined by statute as:
"... any person who undertakes to execute any work which is a part of his trade, business or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof." R.S. 23:1032.
Whenever a person fits the definition of a principal, he shall be obligated by the workers' compensation statute to the injured employees of his contractors. Such a principal is known commonly as a "statutory employer." See Barnes v. Sun Oil. Co., 362 So.2d 761 (La.1978); W. Malone & H. Johnson, Workers' Compensation § 121 (La.Civ.L. Treatise vol. 13 1980).
The original policy behind holding principals liable for the injuries sustained by the employees of his contractors was to prevent principals from contracting out their work in order to avoid workers' compensation liability. Johnson v. Alexander, supra at 454; Broussard v. Heebe's Bakery, Inc., 263 La. 561, 572-73, 268 So.2d 656, 660 (1972); 1C A. Larson, The Law of Workmen's Compensation § 49.00 (1982); W. Malone & H. Johnson, Workers' Compensation, supra. As a trade-off, similar to that given to regular employers, statutory employers have been given immunity from tort suits by their statutory employees. R.S. 23:1032, 1061. Because of the ease of acquiring insurance, and the great protection from tort liability which workers' compensation provides, statutory employer status is desirable for principals against whom tort claims are made by workers employed by others.
Two elements of the § 1032 definition must be met in order for a principal to be considered a statutory employer. First, the "work" must be a part of the principal's "trade, business or occupation." Second, the principal must have been engaged in that trade, business or occupation at the time of the injury. Absent either of these two conditions, the injury will not come *198 within the scope of the workers' compensation program.
Courts must look to the facts of each individual case to determine whether a particular activity is within the scope of a principal's trade, business or occupation. Generally, in order for a work or project to be within a principal's trade, business or occupation, it must be routine or customary, Benson v. Seagraves, 436 So.2d 525, 529 (La.1983); Reeves v. Louisiana & Arkansas Railway Co., 282 So.2d 503, 507-08 (La. 1973), or some other type of activity which is necessary for the principal's day-to-day operations. Put another way, the works contemplated by the statute are those activities which are an actual part of the nature and purpose of the principal's enterprise. Extraordinary or nonrecurring constructions or repairs usually are outside the scope of the trade or business of manufacturing or production concerns. See 1C A. Larson, The Law of Workmen's Compensation § 49.12, at 9-24 to 29 (1982). Only when the enterprise is accustomed to engaging in such projects as a part of its regular activities would such construction type works be covered by the statute. In addition to the regularity or predictability of the activity, it is also important to determine whether the employer normally is equipped to handle such projects, both as to manpower and equipment. Id. at 9-41. General maintenance and repair work, which by their nature allow the smooth and continued operations of the principal, are within the scope of the statute. Barnes v. Sun Oil Co., supra at 764; 1C A. Larson, The Law of Workmen's Compensation § 51.23 (1982).
A principal can, however, be a statutory employer even if the project, during which an employee is injured, is not one of regularity or custom for the principal. Whenever a principal contracts to perform work for anothereven if it is the first and only time that the principal plans to engage in such a projecthe is, for the purposes of injuries resulting from that project, engaged in that trade, business or occupation. R.S. 23:1032.
The scope of the statutory "work" also is important. The specific task to which an individual employee is put should not be determinative of his coverage under the act. Instead, the entire scope of the work contract must be considered. Malone, Principal's Liability for Workmen's Compensation to Employees of Contractors, 10 La.L.Rev. 25, 39 (1949). To hold otherwise would be to allow co-workersemployees of the same contractor, working together on the same projectto have different remedies for injuries resulting from the same accident, depending on whether the principal engaged in the specific task in which one of the employees was working at the time of the accident.
It is irrelevant that the principal has the financial resources or expertise to enter into a particular trade, business or occupation. In order for any person to come within the scope of the statute, he must be engaged in the enterprise at the time of the injury.
Exxon is in the business of refining petroleum and producing chemical products. It employs a large work force at its Baton Rouge chemical plant, where the accident occurred. Many of the employees are able to perform both general maintenance and construction work. According to Mr. J.B. Arbour, Division Manager of the Solvents and Specialty Division of Exxon's Baton Rouge chemical plant, Exxon sought to take advantage of a stable, nonfluctuating work force. Thus, after completion of the so-called Al-dox cosmetic alcohol production unit in 1961, Exxon laid off the bulk of its construction crews. Major construction projects thereafter were contracted out and performed without Exxon employees. At the time of the conversion of the old ethanol plant to isopropanol production (the time of the accident), Exxon had not reversed its policy of contracting out construction work. Mr. Arbour further stated that Exxon could not have performed the conversion work and still maintained the normal operations of the chemical plant with its then-current staff.
*199 In 1970, the Exxon plant suffered a major fire which destroyed a twelve story ethelyne unit. As an emergency measure, Exxon employees were called upon to perform the prompt reconstruction of the EPLA-N unit. This emergency action was not considered as a change of policy.
In 1976, Exxon entered into a contract with H.E. Wiese, Inc. to convert an existing structure from the manufacture of ethanol to the production of isopropanol. As part of the conversion process, various connections to existing structures had to be made. As a part of the connection process, an "orifice run" was to be installed. It was during the installation of the orifice run that plaintiff, an employee of the contractor, was injured.
In this court's original opinion, we found that Exxon's own employees routinely installed such orifice runs throughout the plant's premises, and, therefore, Exxon was in the trade, business or occupation of installing such things. This perception, however, was much too narrow.
The contract project as a whole must be considered. As Exxon has admitted, the orifice was included as a part of the overall plan for the conversion project. While Exxon claims that the run would have been installed even without the conversion, the fact remains that Exxon chose to include it as a "part of the overall package." This broader view of the work as a whole is considerably more reasonable than the narrow view. The "work" contemplated by the statute can hardly be the individual tasks performed by each worker. Plaintiff, it is true, was injured while installing a particular device; his employer, however, was engaged in the conversion of a plant from one manufacturing process to another. The "work" at issue here is the employer's workthe construction project. If Exxon was in the business of plant construction or conversion, it then would be protected by the statute.
During more than fifteen years, from 1961, when Exxon abandoned doing its own construction, until the date of the accident, Exxon engaged in such conversion or reconstruction projects only once, and that one time was an extraordinary exception to Exxon's general policy; it was to rebuild a fire damaged plant, an emergency measure only. "Thus, it was not [Exxon's] business practice to engage in ... construction of this type and magnitude, nor does the record support a conclusion that this type work was customarily done by [Exxon] ..." Reeves v. Louisiana & Arkansas Railway Co., supra at 508. Instead, Exxon was in the business of operating the plant once it was completed. See Thibodaux v. Sun Oil Co., 218 La. 453, 459, 49 So.2d 852, 854 (1950), quoting Horrell v. Gulf & Valley Cotton Oil Co., 15 La.App. 603, 607, 131 So. 709, 712 (1930).
Furthermore, even if Exxon could have used its own employees for the conversion project, the fact remains that Exxon did not. As stated earlier, it is essential that the work done by the contractor be a part of the trade, business or occupation of the principal before the principal is either liable under, or protected by, the workers' compensation statute. Since Exxon consciously decided to get out of the major construction business in 1961, Exxon's plant conversion did not come within the scope of the workers' compensation statute. The record indicates that no regular Exxon employees were engaged in the project.
Since Exxon was not engaged in the trade, business or occupation of plant conversion/reconstruction at the time of the accident, it was not a statutory employer of plaintiff who was engaged in such operations. Consequently, Exxon is not protected by the exclusive remedy rule of the workers' compensation statute. Plaintiff's right to sue ex delicto, therefore, must be sustained.
The judgment of the district court and the court of appeal dismissing the suit of plaintiff Vernon L. Lewis is reversed and set aside, and the case is remanded to the court of appeal for further proceedings consistent with this opinion, at the cost of Exxon Corporation.
*200 DENNIS, J., concurs and assigns reasons.
WATSON, J., dissents, adhering to reasons assigned on original hearing.
DENNIS, Justice, concurring.
I agree with the majority opinion except for the dictum that whenever a principal contracts to perform work for another even if it is the first and only time that the principal plans to engage in such a projecthe is, for the purposes of injuries resulting from that project, engaged in that trade, business or occupation. The statement is a debatable proposition which is unnecessary to a decision in this case.
NOTES
[1] LSA-R.S. 23:1061, "Principal contractors: liability" provides:

"Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed.
"Where the principal is liable to pay compensation under this Section, he shall be entitled to indemnity from any person who independently of this Section would have been liable to pay compensation to the employee or his dependent, and shall have a cause of action therefor."
[2] LSA-R.S. 23:1032, "Exclusiveness of right and remedies; employer's liability to prosecution under other laws" provides:

"The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury, or compensable sickness or disease. For purposes of this Section, the word `principal' shall be defined as any person who undertakes to execute any work which is a part of his trade, business or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof.
"Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act.
"The immunity from civil liability provided by this Section shall not extend to: 1) any officer, director, stockholder, partner or employee of such employer or principal who is not engaged at the time of the injury in the normal course and scope of his employment; and 2) to the liability of any partner in a partnership which has been formed for the purpose of evading any of the provisions of this Section."
[3] Interrogatories propounded to Exxon asked that the company list every construction project similar to this one which had been performed by Exxon's employees as a part of its trade, business or occupation. Exxon responded that it had rebuilt an ethylene unit in 1970. Exxon supplemented its answer immediately prior to trial with information relating to a second construction project, the building of the "Al-dox unit" (Tr. 72) in 1961. Trial was commenced on June 10 and 13, 1980, and completed in September of 1980. In August, after trial had commenced but before its completion, Exxon attempted to supplement its answers by listing four other conversion projects it had undertaken in the 1950's. The trial court granted plaintiff's motion to strike the amendment and sustained a continuing trial objection to testimony about that information. Plaintiff contends that the trial and appellate courts then erred in relying on the inadmissible testimony. Since there is no indication of such reliance and the record gives an ample independent basis for the judgments, this argument lacks merit.