**Calvin DEMERITT and Marjorie Smith Demeritt, Plaintiffs-Appellants,**

v.

**CITGO PETROLEUM CORPORATION, et al., Defendants-Appellees.**

**Perry SEENEY, and Carol A. Seeney, Plaintiffs-Appellants,**

v.

**CITGO PETROLEUM CORPORATION, Cities Service Company and Cities Service Pipe Line Company, Defendants-Appellees.**

Nos. 84–4823, 85–4028.

United States Court of Appeals, Fifth Circuit.

Aug. 30, 1985.

Jones, Jones & Alexander, J.B. Jones, Jr., Michael H. Bercier, Jennifer Jones Bercier, Cameron, La., Tommy C. Rutledge, DeQuincy, La., for plaintiffs-appellants.

Gregory P. Massey, William R. Tete, Jones, Tete, Nolen, Hanchey, Swift & Spears, Lake Charles, La., for defendants-appellees.

Before CLARK, Chief Judge, and THORNBERRY and JONES, Circuit Judges.

PER CURIAM:

Plaintiffs appeal the district court's summary judgment dismissing their claims. We vacate and remand.

## I.

In October 1983 Demeritt and Seeney were injured in an explosion at a Citgo Petroleum Corp. (Citgo) refinery in Westlake, Louisiana. Both men were employed at that time by Payne & Keller Co. (Payne), which had contracted with Citgo to perform a type of maintenance work known as a turnaround on the Lurgi Unit of the refinery.

Demeritt and Seeney filed separate actions seeking damages against Citgo. In each case Citgo filed a summary judgment motion asserting that Citgo was the injured worker's statutory employer under La.Rev. Stat.Ann. § 23:1061 (West 1964). La.Rev. Stat.Ann. § 23:1032 (West Supp.1985) provides a statutory employer with immunity from liability beyond compensation benefits. The district court granted Citgo's motions and dismissed both cases. When Seeney and Demeritt appealed, their cases were consolidated by this court.

## II.

### A.

■ The determination of whether a statutory employer relationship exists between a contractor and employees of a subcontractor is primarily a factual issue that must be decided on a case-by-case basis. *Lewis v. Exxon Corp.*, 441 So.2d 192, 197 (La.1983). In resolving this question, the court must consider the entire scope of the work contract, not merely the specific task to which the injured employee was assigned. *Id.* at 199. The Louisiana Supreme Court has enunciated a two-part test for evaluating the existence of a statutory employer relationship:

> First, the "work" [performed by the injured worker] must be part of the principal's "trade, business or occupation." Second, the principal must have been engaged in that trade, business or occupation at the time of the injury.

*Lewis v. Exxon Corp.*, 441 So.2d at 197. See also *Blanks v. Murco Drilling Corp.*, 766 F.2d 891, 895–97 (5th Cir.1985), and *Zuccarello v. Exxon Corp.*, 756 F.2d 402,

408 (5th Cir.1985), wherein this court applied *Lewis* to find that a statutory employer relationship did exist.

In *Lewis*, the court explained that routine or customary activities necessary for the principal's day-to-day operations usually will be considered within the scope of the statute, while "extraordinary or nonrecurring construction or repairs" will be outside of its ambit. One factor to be used in determining if the specific activity is part of the principal's regular activities is whether the principal normally possesses the manpower and equipment necessary to handle the project. *Id.* at 198.

Recently, in a decision issued after judgment was entered in the present case, the Louisiana Supreme Court further defined the *Lewis* test. *Rowe v. Northwestern Insurance Co.*, 471 So.2d 226 (La.1985). The court ruled that even routine maintenance work cannot be considered part of the principal's business unless the principal customarily uses its own employees to perform the specific type of work at issue. *Id.* at 228–229.

The plaintiff in *Rowe* was an electrician employed by a contractor hired to work at a bulk liquid importing facility owned by Cargill, Inc. Rowe was assigned to disconnect the electrical power from a centrifugal pump so that Cargill's employees could clean and rebuild the pump. The affidavit of Cargill's regional manager described this as routine maintenance necessary to the operation of the facility. After Cargill's employees had completed their tasks, Rowe reconnected the power. When the pump was tested, a coupling thrown from the shaft of the motor struck Rowe in the leg.

The trial court entered summary judgment for the defendant on the grounds that Cargill was Rowe's statutory employer. In affirming this decision, the Court of Appeals relied primarily on two facts: (1) Cargill's employees performed this function on a nationwide basis and (2) the bulk liquid facility commonly borrowed electricians capable of doing Rowe's task from the Cargill grain elevator located on the same tract

of land as the bulk liquid facility. *Id.* at 228.

This decision was reversed by the Louisiana Supreme Court which found that the record showed the bulk liquid facility customarily contracted out the type of work that Rowe was performing when he was injured. The borrowed electricians did only minor work and had never reconnected the pump's power. The fact that Cargill employees at other facilities did perform this type of work was not considered essential to the court's decision. *Id.* Because this particular facility customarily contracted out the type of work at issue, instead of using its own employees, Rowe's work could not be considered part of Cargill's business, even though it was a part of routine maintenance. *Id.* at 229.

### B.

█ The record in the instant case presents material issues of fact as to whether Citgo is entitled to assert the statutory employer defense under the guidelines set forth in *Rowe* and *Lewis*. Citgo did not submit its contract with Payne, nor did it provide a description of the actual work involved in the Lurgi turnaround. According to the affidavit of A.J. Lungaro, Citgo's manager of turnarounds at the Westlake refinery, the Lurgi Unit operates only when needed to meet market demand. It is shut down whenever the supply exceeds the demand. A turnaround is necessary to restore the unit to operational efficiency before it can be restarted. He describes the turnaround as routine maintenance. Demeritt's affidavit, however, describes Payne's work at the Lurgi Unit as a rebuilding process that required the reworking of over 90% of the unit.

Furthermore, there is a question as to whether Citgo customarily used its own employees to perform the type of work for which Payne was contracted. Lungaro asserts that it does and that Citgo employees would have performed the Lurgi turnaround except for the fact that all maintenance employees normally available had been assigned to rebuild another unit dam-

aged by a fire. To support this assertion, he points out that in 1983 Citgo employees performed 85—90% of the work involved in completing a turnaround on another unit, the A Catalytic Cracker. However, Lungaro does not describe the work involved in the A Catalytic Cracker turnaround or identify which functions were assigned to the outside contractors. His affidavit does not present sufficient information to permit a conclusion that the work Citgo's employees performed at the A Catalytic Cracker was essentially the same as that performed by Payne's employees at the Lurgi Unit. Moreover, Lungaro concedes that Citgo contracted out the 1979 turnaround of the Lurgi Unit and that 50% of the 1982 turnaround was performed by an outside contractor.

Plaintiffs submitted three affidavits stating that since the late-1970's Citgo's policy has been to contract out all major turnarounds. In its opinion, the district court discussed only one of these affidavits—that submitted by C.L. Jinks, a former Citgo safety inspector who retired in 1982. Although Jinks averred that Citgo's policy in recent years was to contract out its major turnarounds, the district court disregarded the affidavit on the grounds that Jinks' retirement precluded him from having personal knowledge of Citgo's practices in 1983.

We need not decide whether the district court was correct in disregarding Jinks' affidavit. The affidavits of Demeritt and Edwin Broussard, Citgo's former turnaround supervisor, also state that Citgo instituted the policy of contracting out major turnarounds in 1978 or 1979 and continued that practice at least through 1983. Although Broussard, like Jinks, had retired from Citgo's employ before 1983, he has knowledge of Citgo's practices in 1983 because he has worked for several companies, including Payne, that bid on the turnaround contracts offered by Citgo. Demeritt, also a former Citgo employee who resigned in July 1983, based his knowledge of Citgo's current practices on his experiences working for contractors hired by Citgo, as

well as discussions with friends still employed by Citgo. Both Demeritt and Broussard aver that Citgo had contracted out turnarounds of the B Reformer and the Lurgi Unit in support of the averment that Citgo's policy was to use outside companies to complete major turnarounds. Demeritt's affidavit adds that Citgo employees performed only minor tasks that could be accomplished without shutting down the unit, not "re-working type projects" such as the turnaround of the issue.

### C.

The ascertainment of the type of work covered by Payne's contract with Citgo and the determination of whether Citgo customarily used its own employees to perform this type of work at its Westlake refinery are essential prerequisites to a ruling on the availability of the statutory employer defense. The record before us shows that there are genuine disputes of material fact in regard to these two issues. Therefore, under Fed.R.Civ.P. 56(c), summary judgment was inappropriate.

### III.

The judgment of the district court is vacated and this case is remanded for further proceedings not inconsistent with this opinion. We intimate no view on the ultimate resolution of the merits or on the outcome of any future motion for summary judgment based on other proof or affidavits.

VACATED and REMANDED.