Sam BRADLEY, Jr., Plaintiff–Appellee,

v.

Dean CLARK, an individual, and Clark Operating Services, Inc., a corporation, Defendants–Appellants,

and

Gray Bear Well Servicing, Inc., a corporation, and Peak Producers, Inc., a corporation, Defendants.

No. 65297.

Supreme Court of Oklahoma.

July 17, 1990.

Rehearing Denied Feb. 5, 1991.

426

Richard D. Gibbon, Gibbon, Gladd & Associates, Tulsa, for defendants-appellants.

Michael D. Parks, Stipe, Gossett, Stipe, Harper, Estes, McCune & Parks, McAlester, for plaintiff-appellee.

OPALA, Vice Chief Justice.

The dispositive question is whether the trial judge's verdict, which implicitly finds that the two defendants did not bear secondary liability under § 11,[1] is supported by competent evidence. We answer in the affirmative.

## I

## THE ANATOMY OF LITIGATION

The plaintiff, Sam Bradley, Jr. [worker], sustained on-the-job injuries on October 28,

---

1. See 85 O.S.1981 §§ 11, 12 and 44, the statutory provisions in effect at the time of the worker's injuries.

The terms of § 11 provided in pertinent part: " * * * 1. The independent contractor shall, at all times, be liable for compensation due to his direct employees, or the employees of any subcontractor or such independent contractor, and *the principal employer shall also be liable in the manner hereinafter specified for compensation due all direct employees, employees of the independent contractors, subcontractors, or other employees engaged in the general employer's business.*

2. The person entitled to such compensation shall have the right to recover the same directly from his immediate employer, the independent contractor or intermediate contractor, and such claims may be presented against all such persons in one proceeding. *If it appears in such proceeding that the principal employer has failed to require a compliance with the Workers' Compensation Act of this state, by his or their independent contractor, then such employee may proceed against such principal employer without regard to liability of any independent, intermediate or other contractor.* * * * " (Emphasis added.)

Section 11 was amended in 1985 [Okl.Sess.L. 1985, Ch. 266, § 2, eff. November 1, 1985].

Section 12 provided in pertinent part:
"The liability prescribed in [§ 11] ... *shall be exclusive and in place of all other liability of the employer and any of his employees,* at common law or otherwise, for such injury, loss of services or death, to the employee, spouse, personal representative, parents, dependents, or any other person...." (Emphasis added.)

Section 12 was amended in 1982 and 1984 [Okl. Sess.L.1982, Ch. 37, § 1, eff. March 26, 1982 and Okl.Sess.L.1984, Ch. 81, § 1].

Section 44 provided in pertinent part:
"(a) If a worker entitled to compensation under the Workers' Compensation Act is injured or killed by the negligence or wrong of *another not in the same employ,* such injured worker shall, before any suit or claim under the Workers' Compensation Act, elect whether to take compensation under the Workers' Compensation Act, or to pursue his remedy against such other. ..." (Emphasis added.)

Section 44 was amended in 1986 [Okl.Sess.L. 1986, Ch. 222, § 18, eff. November 1, 1986].

1981[2] in an oil field accident. He brought a negligence action against Clark Operating Services [Operator or hirer] and Dean Clark [individual interest holder or Clark]. All the issues were stipulated except as to the two defendants' status *qua* secondary obligors under § 11 of the Workers' Compensation Act.[3] After a bench trial the judge ruled the worker's claim was not barred by the exclusivity provisions in the compensation laws and gave him judgment.

## II

## STANDARD OF REVIEW

■ In a common-law case where the jury is waived, the trial judge's determination of the facts bears the force of a verdict rendered by a well-instructed jury. *It must be affirmed if supported by any competent evidence.*[4]

## III

## OPERATOR'S STATUS UNDER § 11

■ The Operator—as hirer of an independent contractor—is protected by the Act's immunity provisions only if the hirer is found to be the worker's "§ 11 principal employer",[5] i.e. one secondarily liable to the worker in compensation.

### A. The "necessary and integral" test for determining hirer's status as a § 11 employer

■ In *W.P. Atkinson Enterprises, Inc. v. District Court*[6] the court adopted the "necessary and integral" test for measuring the hirer's overlapping coverage obligation for on-the-job injuries sustained by the employees of an independent contractor. The court abandoned the "pecuniary gain" analysis which had called for overlapping coverage by the hirer for *any task beneficial to a hirer's business for profit.*[7] In *Murphy v. Chickasha Mobile Homes, Inc.*[8] the court further refined the hirer's liability by fashioning a two-part, task-related standard for determining whether an activity is "necessary and integral" to the hirer's business.[9] Consistently with *Atkinson* and *Murphy*, the operator, *qua* hirer, when haled as a defendant in a common-law tort action, *must demonstrate by custom or practice of the marketplace* that "killing" of a well is integral to keeping the well in production. Integration of well servicing with day-to-day operations cannot be accomplished by judicial fiat.

■ We adopt the three-tier test crafted by the Louisiana Supreme Court for deter-

---

**2.** After-enacted amendments of 85 O.S.1981 §§ 11, 12 and 44, *supra* note 1, effective after the date of the worker's October 28, 1981 injury, are of no legal significance here. Absent express or implied legislative intent to the contrary, an amendment to the Workers' Compensation Act is inapplicable to injuries sustained prior to its enactment. *Weber v. Armco, Inc.*, Okl., 663 P.2d 1221, 1227 [1983]. There is no indication of any such legislative intent in the after-enacted amendments and none has been advanced by the parties.

**3.** At the jury-waived trial the parties stipulated the case would be tried on the sole issue of whether the worker's claim was barred by the exclusivity provisions of the Workers' Compensation Act. In the event the trial court decided it had jurisdiction over the claim, they agreed to waive the allegations and the defenses of negligence. The parties also stipulated to the amount of damages ($400,000.00).

**4.** *United Engines, Inc. v. McConnell Const., Inc.*, Okl., 641 P.2d 1101, 1102 [1981]; *Leveridge v. Notaras,* Okl., 433 P.2d 935, 941 [1967]; *Bullard v. Caulk,* 206 Okl. 353, 243 P.2d 691, 694 [1952].

**5.** 85 O.S.1981 §§ 11 and 12. See *supra* note 1 for the pertinent provisions of §§ 11 and 12.

**6.** Okl., 516 P.2d 541, 544 [1973].

**7.** See also *Lambert v. Inryco, Inc.*, 569 F.Supp. 908, 916 [W.D.Okl.1982] (citing *Murphy v. Chickasha Mobile Homes, Inc., infra* note 8), where the federal court correctly interpreted Oklahoma's compensation laws, noting that "[i]f the subcontractor is merely a medium through whom the principal employer is pursuing the day-to-day activities of his own business then the principal employer is immune from suit by such an employee by reason of its workers' compensation coverage...."

**8.** Okl., 611 P.2d 243 [1980].

**9.** "Tasks performed by an independent contractor are 'necessary and integral' part of the hirer's operations within the meaning of the test when they [1] are *directly associated with the day-to-day activity carried on by the hirer's line of trade,* industry or business or [2] would customarily be done in that line of business." *Murphy v. Chickasha Mobile Homes, Inc., supra* note 8 at 248. (Emphasis added.)

mining an entity's statutory employer status.[10] Under that test maintenance work would not be considered part of the hirer's business, unless the hirer customarily uses its own employees to perform the specific type of work in contest.[11] If the task performed by the independent contractor is beyond the skill, training, expertise or capability of the hirer's employees, it must be regarded as beyond the scope of the hirer's regular maintenance activities. This analysis allows the court to consider the hirer's size and complexity in relation to the task to be performed in order to ascertain that entity's statutory employer status. Louisiana's more restrictive approach is harmonious with our own institutional design fashioned in *Murphy* and serves here as a sharp tool for implementing the *Murphy* standards.

### B. *Competent evidence supports the Operator's nonliability in compensation*

■ The Operator's business is the management of producing oil and gas leas-

---

**10.** The Louisiana Supreme Court recently shifted its interpretative analysis for identifying the statutory employer status from one which favored an expansive application of the double-coverage doctrine to a more restrictive approach. The court crafted the three-tier test to bring Louisiana's jurisprudence in line with the legislative purpose of its secondary liability statute. See *Rowe v. Northwestern Nat. Ins. Co.*, 471 So.2d 226 [La.1985]; *Berry v. Holston Well Service, Inc.*, 488 So.2d 934, 937–939 [La.1986]. The court in *Berry, supra* at 937–939, fashions a three-tier analysis for determining a statutory employment status between an owner (or hirer) and an independent contractor's employee:

[1] The first level primarily focuses on the scope of the contract work, rather than on an individual task of the injured worker. The specific inquiry is whether the contract work is *specialized or non-specialized* and it takes into consideration whether the work requires a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field. If the contract work is *specialized per se*, it is not, as a matter of law, a part of the hirer's trade, business or occupation.

[2] If it is determined that the contract work is *non-specialized*, then the inquiry would shift to a comparison of the hirer's trade, business or occupation and the contract work to see if the latter can be considered part of the hirer's trade, business or occupation. Louisiana's jurisprudence has forged several guidelines, in no way exhaustive, which help to resolve this issue. Several factors, which have been considered, are: (a) Is the contract work routine and customary? That is, is it regular and predictable? Nonrecurring or extraordinary construction and repairs are usually held outside the scope of the statutory doctrine. (b) Does the principal have the equipment and/or manpower capable of performing the contract work? This sub-species of the speciality inquiry focuses on determining whether the contract work, *as it relates to the hirer*, is ordinarily handled through employees. (c) What is the industry practice relative to the contract work? Do industry participants normally contract out this type of work, or do they have their own employees perform

it? According to *Berry* at 938, "[t]hese guidelines are not absolute or rigid, but are instead to be applied relatively, taking into consideration the size, complexity, integration (either horizontal or vertical), or the lack thereof, etc. of the principal. What may be nonrecurring to a small concern, may for an industry giant be regular. Similarly while the type of contract work may be non-specialized (i.e. manual labor), for a small concern it may well be beyond the expertise or capability of its employees. 1 A. Larson, Workmen's Compensation for Occupational Injuries and Death, § 49.13 (Desk ed. 1985). Basically, the factors developed by the jurisprudence strive to answer the overriding question of 'whether [the contract work] is, *in that business*, normally carried on through employees rather than independent contractors.'" *Berry, supra* at 938, quoting from Larson, *supra*. (Emphasis in *Berry*.)

[3] The third and last tier of the *Berry* statutory-employment analysis calls upon the court to determine whether the principal hirer was engaged, at the time of the injury, in the trade, business or occupation of the hired contractor. This test appears to have been initiated in *Lewis v. Exxon Corp.*, 441 So.2d 192, 197 [La.1984] (opinion on rehearing), where the court determined the hirer, a chemical plant operator, was not a statutory employer. In *Lewis*, the hirer had in the past used its employees for major construction work on the plant premises, but in 1961 decided to cease that line of work and laid off most members of its construction crews. All major projects were thereafter contracted out and performed by other entities. While the hirer clearly had the resources and the manpower to do the work in controversy—a plant conversion project—the court deemed this fact irrelevant in determining the hirer's statutory-employment status. This is so because, the court held, the hirer was not *actually engaged in major construction work at the time of the accident (1977).*

**11.** See also *Demeritt v. Citgo Petroleum Corp.*, 769 F.2d 1081, 1082–1083 [5th Cir.1985], applying Louisiana law under the new test first enunciated in *Rowe v. Northwestern Nat. Ins. Co.*, *supra* note 10.

es. It maintains a small staff, consisting of a president, a secretary and 4 or 5 contract pumpers. The president's duties include, inter alia, supervising the daily operations of the wells, hiring and overseeing pumpers, checking on the wells once or twice a day, paying all the bills, preparing paperwork for the Corporation Commission and preparing monthly statements for working interest holders. When repairs are needed at the well site, outside well servicing companies are hired to remedy the problem.

The Operator managed the well in suit ["Keck" well] under an operating agreement with the working interest holders. The well developed leakage from the tubing into the well's annulus area and required the pulling of rods and tubing. Several independent contractors were hired by the Operator with each called upon to perform a discrete and sequential portion of the job. One contractor, Service Fracturing Company [Serfco], was engaged to "kill" [12] the well, the first step in pulling the rods and tubing. Gray Bear Well Services was hired to pull the tubing and Osage Water Company to provide water to Serfco for pumping down the well. The worker, Serfco's employee, was attempting to open a valve that would increase water pressure in the annulus to complete the "kill" process when the valve exploded. He sustained severe injuries to his face.

According to the Operator-president's testimony, "killing" of a well is not a part of the Operator's day-to-day activities, nor is it customarily done in that line of business. The well in suit had never before needed "killing" and would need it only once a year thereafter. Serfco owned and used its own "pump truck" while performing "kill" jobs; the Operator had no such truck. There is no evidence that one who operates a producing well either owns the expensive equipment or has the skills to do this type of work as a daily activity of managing a producing mineral leasehold. The mere existence here of the ongoing well servicing business and its use of specialized equipment not provided by the Operator indicates a need for the service within the industry and affords sufficient support for the nisi prius finding that the function in contest is neither "directly associated with the day-to-day activity" of an operator, nor "customarily done" as part of an operator's industry.

Because there is competent evidence to support the nisi prius determination that the Operator did not bear secondary-liability under § 11, we hold the Operator was unprotected by the Act's shield of immunity from tort liability.

## IV

## INDIVIDUAL INTEREST HOLDER'S STATUS UNDER § 11

■ The answer to the question whether the "interest holder" is statutorily immune from tort liability depends upon the exact nature of Clark's relationship with the worker. Immunity can attach only if the interest holder (1) is the worker's § 11 principal employer [13] or (2) is otherwise "in the same employ" as the worker.[14] Neither status is invocable here.

On the day this job was to be done, the Operator's president, himself unable to be present, had his father, Clark, represent him at the well site. The president delegated to his father all duties and responsibilities of supervising the pulling of the rods and tubing. Clark had the authority to bind the Operator as to any decision he made. Clark was not on the Operator's payroll; neither was he paid to oversee the operation. At the time of the accident there was no contractual agreement between Clark and either the Operator or

---

**12.** A well is "killed" by pumping enough water into the well to equalize or overcome the down hole pressure, so that the rods and tubing can be pulled to determine the cause of a leak.

**13.** See discussion in Part III(A) *supra* regarding the Operator's § 11 principal employer status.

**14.** *O'Baugh v. Drilling Well Control, Inc.,* Okl., 609 P.2d 355, 356 [1980], citing 85 O.S.1981 §§ 11, 12 and 44 (see *supra* note 1 for the pertinent text of these statutes); *Carroll v. District Ct. of Fifteenth Jud. Dist.,* Okl., 579 P.2d 828, 831–832 [1978].

Serfco. He appeared at the well site solely as a favor to his son.

Clark's regular business is that of exploration and drilling. He has no employees on his payroll and owns no equipment that could be used in "killing" a well. He drilled the "Keck" well and turned it over to his son's operating company when it reached production in August 1981. At that time Clark relinquished all control over the well and no longer participated in its daily operation. On the day of the accident, Clark had no separate "exploration or drilling" business that he was performing at the well site. His sole interest in the well was that of an individual interest owner. He instructed Serfco's engineer about what needed to be done to correct the leakage problem but did not physically help with any phase of the operation.

The Operator and Clark argue that the four groups present at the well site (Operator, Serfco, Gray Bear and Osage) are all independent contractors cooperating in a common task for the working interest owners *qua* principal employer to place the well back in production. Clark, as the Operator's representative, had the task of supervising and coordinating the efforts of the other three independent contractors in remedying the leakage problem. The defendants, relying on *O'Baugh v. Drilling Well Control, Inc.*,[15] assert that because the four independent contractors were performing a common task for the same principal employer, they were all in the "same employ" at the time of the accident and hence immune from tort liability.

The defendants' reliance on *O'Baugh* is misplaced. In *O'Baugh* an employee of an independent contractor brought a tort action against another independent contractor who was present and working on the same task of unplugging an oil well for the principal hirer. The court held that because the two independent contractors "were performing a common task for the same principal employer," they and their

employees were "in the same employ" of the operator under § 44[16] and thus shielded from tort liability. In the present case, the worker and Clark were in a vertical employment structure akin to that in *Murphy*. The Operator—not the working interest owners—hired Serfco to perform the "kill" process. The evidence is clear that Clark was present at the well site neither as the worker's statutory employer nor as an independent contractor to work along with Serfco in killing the well. On the day of the accident, Clark was, as a practical matter, the Operator's alter ego. He would not be entitled to tort immunity under an *O'Baugh* "common-task" analysis.

Assuming Clark were the Operator's agent or employee, he would not be protected from tort liability. His immunity in that instance can only be derived from the Operator's § 11 employer status. Because we have determined that the Operator did not stand in the status of a statutory employer, the Act does not shield Clark from common-law tort liability.

V

COMPETENT EVIDENCE SUPPORTS THE OPERATOR'S AND THE INTEREST HOLDER'S NONLIABILITY IN COMPENSATION

We hold that all the facts and inferences in the record relied upon for resolution of the Operator's and interest holder's status are consistent with their nonliability as secondary obligors under § 11 of the Act.

The trial court's judgment is affirmed.

HARGRAVE, C.J., and HODGES, DOOLIN and KAUGER, JJ., concur.

ALMA WILSON, J., concurs specially.

SUMMERS, J., concurs in judgment.

LAVENDER and SIMMS, JJ., dissent.

---

15. *Supra* note 14. Although the test outlined in *O'Baugh* has been abrogated by subsequent legislation [Okl.Sess.L.1982, Ch. 37, § 1, eff. March 26, 1982], it is apposite since it was valid at the time of the accident. See *supra* note 2.

16. 85 O.S.1981 § 44. See *supra* note 1 for the pertinent provisions of § 44.

ALMA WILSON, Justice, concurring specially:

I agree with the majority opinion that tort immunity in 85 O.S.1981, § 12 shields only those principal employers who bear workers' compensation liability under 85 O.S.1981, § 11. The restricted "necessary and integral" test adopted today relieves hirers of independent contractors, other than principal employers, of unwarranted secondary workers' compensation liability exposure and secures the constitutional right of access to our courts to persons injured by tortious hirers of independent contractors, other than principal employers. The restricted "necessary and integral" test preserves the employers' workers' compensation liability imposed under § 11, the exclusivity of the employers' workers' compensation liability declared by § 12, and the employees' election and coordination of remedies required by § 44.

Accordingly, I concur specially.