2006 OK CIV APP 62

Marcy MONTGOMERY, an individual, Plaintiff/Appellant,

and

Robert Montgomery, an individual, Plaintiff,

v.

TIMBERBROOK HOMEOWNERS ASSO-CIATION, INC., an Oklahoma non-profit corporation, Defendant/Third–Party Plaintiff/Appellee,

and

Swim Management and Consulting Services, Inc., d/b/a Swim Management d/b/a Miller Swim School, an Oklahoma Corporation, Third–Party Defendant.

No. 101,763.

Court of Civil Appeals of Oklahoma, Division No. 3.

April 28, 2006.

---

728

Pamela K. Morgan, Jack G. Zurawik, Jack G. Zurawik, P.C., Tulsa, OK, for Plaintiff/Appellant.

Mitchell D. Blackburn, Conner & Winters, L.L.P., Oklahoma City, OK, for Defendant/Appellee.

Opinion by KENNETH L. BUETTNER, Chief Judge.

¶1 Marcy Montgomery was a lifeguard employed by Swim Management and Consulting Services, Inc., which had contracted with Timberbrook Homeowners Association to run all facets of its common area pool. She was injured during this employment. Swim Management covered her injury through its workers' compensation insurance. She then sued Timberbrook Homeowners Association for negligent maintenance of the lifeguard chair. Timberbrook filed a motion for summary judgment claiming it was a "principal employer," hence immune from lia-

bility pursuant to the Workers' Compensation Act. The trial court granted summary judgment in favor of Timberbrook. We affirm.

¶2 The facts in this case are undisputed. Montgomery was an employee of Swim Management. Swim Management and Timberbrook entered a contract May 24, 2000 in which they agreed that Swim Management would operate and manage the swimming pool located in the common area of Timberbrook. Montgomery's Worker's Compensation Court Form 3, filed March 8, 2001, states that the accident occurred July 5, 2000 when the lifeguard chair snapped off at the base, spilling her to the concrete. She claimed to have injured her back, neck, head and left hand.

¶3 Swim Management did not contest the workers' compensation claim. Montgomery and her father, Robert Montgomery, sued Timberbrook July 2, 2002 for negligent maintenance of the premises. Timberbrook then filed an unopposed motion to add third-party defendant Swim Management October 11, 2002 which was granted October 15, 2002.[1] Robert Montgomery dismissed his cause without prejudice November 13, 2002.

¶4 "Although a trial court in making a decision on whether summary judgment is appropriate considers factual matters, the ultimate decision turns on purely legal determinations, i.e. whether one party is entitled to judgment as a matter of law because there are no material disputed factual questions. Therefore, as the decision involves purely legal determinations, the appellate standard of review of a trial court's grant of summary judgment is *de novo*." *Carmichael v. Beller*, 1996 OK 48, ¶2, 914 P.2d 1051, 1053. "We will not reverse a grant of summary judgment where the record on appeal establishes no substantial controversy of material fact and the prevailing party is entitled to judgment as a matter of law." *Hatcher v. Super*

---

1. The trial court denied Swim Management's Motion for Summary Judgment against Timberbrook (claiming immunity from indemnity because of the Workers' Compensation Act) and also denied Timberbrook's Motion for Summary Judgment against Swim Management (claiming

Swim Management would be liable for indemnity under their contract). The trial court certified the order pursuant to 12 O.S.2001 § 952(b)(3), and, by order dated March 28, 2005, the Supreme Court directed the appeal proceed under 12 O.S.2001 § 994.

*C Mart,* 2001 OK CIV APP 59, ¶ 2, 24 P.3d 377, 378.

¶ 5 Timberbrook moved for summary judgment on the ground that it was Swim Management's principal employer and thus enjoyed statutory immunity from common law liability provided pursuant to the Workers' Compensation Act. Title 85 O.S.2001 § 11(B)(1) provides that an independent contractor and the principal employer are liable for compensation due direct employees.[2] Section 12 states that the liability prescribed in Section 11 "shall be exclusive and in place of all other liability of the employer and any of his employees, ..."

¶ 6 Timberbrook manages and maintains the common areas of the residential development, including the pool. Timberbrook contracted with Swim Management to manage and staff the swimming pool. Montgomery was an employee of Swim Management, and was injured while serving as a lifeguard at the pool. She received workers' compensation benefits for this injury. The question on summary judgment was whether Timberbrook, as a matter of law, was a principal employer and thus, immune from liability.

¶ 7 Timberbrook's first exhibit was an affidavit from Leo Hall stating that he was the homeowner association's president in July 2000 and that Timberbrook managed and maintained the common areas of the addition, which included a swimming pool. He stated that the management and maintenance of the swimming pool was one aspect of the day-to-day activities of Timberbrook. In May 2000, Timberbrook contracted with Swim Management to maintain and operate the pool. The Contract recites that Swim Management is in the business of management and maintenance of public swimming pool facilities and grounds, and Timberbrook is the owner of a public swimming pool facility. Timberbrook desired to hire Swim Management to manage and maintain the pool upon certain terms and conditions, including staffing a manager with certifications required by code to manage the day-to-day operations of the pool, subject to the general policies of the Timberbrook pool committee. There were twenty-one specific terms and conditions for Swim Management to follow. Swim Management "... will hire and dismiss employees to assist in the pool operation within its discretion. SMI [Swim Management] will contract various businesses and service companies to provide necessary services on equipment and repairs if those services are needed at Timberbrook's expense." Timberbrook also submitted Montgomery's Workers' Compensation Form 3 and Swim Management's Form 10, admitting the injury and that it had commenced payment of temporary total disability payments. Timberbrook submitted its Certificate and Articles of Incorporation. Article X, "Committees" included the Pool Facility Committee "which shall have the responsibility of managing the pool. This shall entail preparing the budget to be submitted to the Board of Directors for approval, establishing pool rules and seasons, and hiring the necessary personnel to see that the pool functions properly. Maintenance contracts or hired maintenance personnel, as well as operational personnel, shall be handled by the Pool Committee."

¶ 8 Besides 85 O.S.2001 §§ 11, 12, Timberbrook also cites *Murphy v. Chickasha Mobile Homes, Inc.,* 1980 OK 75, 611 P.2d 243, to support its position that the facts lead to the conclusion that it is a principal employer and thus, immune from liability.

¶ 9 Montgomery relied on the Contract and the Form 10, and the Workers' Compensation Act. However, she argues the tests the Supreme Court adopted after *Murphy* as articulated in *Bradley v. Clark,* 1990 OK 73, 804 P.2d 425, lead to the conclusion that Timberbrook is not a principal employer.

¶ 10 In *Murphy v. Chickasha Mobile Homes, Inc.,* 1980 OK 75, 611 P.2d 243, Apollo Building Systems was an independent contractor of Chickasha Mobile Homes. Apollo was building an addition to the plant's premises when one of its workers, Jesse

---

2. 85 O.S.2001 § 11(B)(1), in part: The independent contractor shall, at all times, be liable for compensation due to his or her direct employees, or the employees of any subcontractor of such independent contractor, and the principal employer shall also be liable in the manner hereinafter specified for compensation due all direct employees, employees of the independent contractors, subcontractors, or other employees engaged in the general employer's business; ....

Murphy, was killed. His administrator brought an action for wrongful death against Chickasha Mobile Homes. The trial court sustained Defendant's Motion to Dismiss ruling that as a statutory employer, Chickasha Mobile Homes was immune from liability pursuant to the Workers' Compensation Act. The *Murphy* court stated at ¶ 2, p. 244:

A principal employer, within the meaning of the compensation law, must be defined in terms of the task for the performance of which he hired the independent contractor. Proper application of the test requires a two-step consideration: [1] the task being performed by the worker, when injured, must be necessary and integral part of hirer's day-to-day business operations or [2] one that is within the range of activities customarily carried out by one in the hirer's line of business.

¶ 11 The *Murphy* court clarified the "necessary and integral" test stating the hirer's operations "[1] are directly associated with the day-to-day activity carried on by the hirer's line of trade, industry or business or [2] would customarily be done in that line of business. The activities encompassed by the contractual relationship of the statutory employer and the skills needed for their performance must necessarily be germane to, and considered part and parcel of, that employer's day-to-day business operations." *Id.* at ¶ 10, p. 248.

¶ 12 The Oklahoma Supreme Court in *Bradley v. Clark*, 1990 OK 73, 804 P.2d 425, adopted a three-tier test for determining statutory employer status. It does not overrule *Murphy*, but rather serves as "sharp tool for implementing the *Murphy* standards." *Id.* at ¶ 6, p. 428. In *Bradley*, the alleged principal employer had a business of managing producing oil and gas leases. It had a president, secretary, and four or five contract pumpers. The president performed all the hands-on duties such as checking the wells daily, paying bills, and accounting for the working interest holders. He hired servicing companies for repairs. One well developed a leak and had to have rods and tubing pulled. A service fracturing company was contracted to "kill" the well, the first step in the process. One of its workers was injured during the process. He later sued the business owner who testified that killing is not part of his day-to-day activities, nor customary in that business. Further, he stated that particular well had never needed killing and would only need killing once a year in the future. The service company owned and used its own truck while performing the kill jobs. The court stated that there was no evidence that one who operates a producing well either owns the expensive equipment or has the skills to do the kind of work as a daily activity of managing producing mineral leasehold. The Oklahoma Supreme Court found that the trial court's determination that the Operator did not bear secondary liability under § 11 was supported by competent evidence. The function was not directly associated with the day-to-day activity of an operator nor customarily done as part of an operator's industry.

¶ 13 The three-tier test adopted by *Bradley* to determine principal employer status was adopted from the State of Louisiana. The Oklahoma Supreme Court stated "[i]f the task performed by the independent contractor is beyond the skill, training, expertise or capability of the hirer's employees, it must be regarded as beyond the scope of the hirer's regular maintenance activities." *Id.* at ¶ 6, p. 248. The court gave the reason that this permitted courts to consider the contractor's size and complexity in relation to the task to be performed.

¶ 14 The *Bradley* court analyzed Louisiana's three-tier approach. The first level focuses on the scope of the work. If the contract work is specialized *per se*, it is not, as a matter of law, part of the hirer's trade, business or occupation. The court would consider such things as whether the work requires a degree of skill, training, experience, education or equipment not normally possessed by those outside the independent contractor's field. If the court determines that the work is non-specialized, then the court compares in the second tier the hirer's trade with the contract work to determine whether the contract work could be considered part of the hirer's trade or business. There follows a nonexhaustive list of guidelines, which, in the end answers the question

whether, in that particular business, the contract work is normally performed by employees or contract workers. This approach allows for consideration of a variety of businesses. What may be an everyday occurrence for a large business may be an isolated event for a small concern. The third tier of the analysis asks the question whether the hirer was engaged in the same business of the hired contractor.

¶ 15 In accordance with the *Murphy* test, the tasks being performed by Swim Management were necessary and integral to Timberbrook's day-to-day business operations. It was responsible for operating and maintaining the pool. That work is customarily carried out by owners of public swimming pools. The fact that the neighborhood association chose to hire an independent contractor, Swim Management, to perform its day-to-day business operations, with respect to pool operations, does not take this case outside of *Murphy*.

¶ 16 Next, the pool operations and maintenance duties are not specialized as contemplated by *Bradley*. The duties do not require a "degree of skill, training, experience, education or equipment not normally possessed outside the contract field." 804 P.2d at 428, n. 10. In other words, it would be just as common for pool owners to use employees to perform these duties as to hire independent contractors. The second part of the *Bradley* test is whether the contract work can be considered part of the hirer's trade or business. In this case, it is the same. In order for Timberbrook to accomplish its business of operating and maintaining the community pool, it would have to do the same tasks as Swim Management, *i.e.,* the work was routine and customary for pool owners.

¶ 17 The final test in *Bradley* is whether the hirer was engaged in the same trade or business as the independent contractor at the time of the injury. This test is based upon *Lewis v. Exxon Corp.,* 441 So.2d 192, 197 (La.1984) in which the question was whether a chemical plant operator was a statutory employee. In the past, the plant operator had used its own employees for major construction projects. The operator chose to stop doing its own construction and laid off its construction crews. In that case, because the plant operator was not then in the construction business, even though it had the resources and manpower, the plant operator was not a statutory employer.

¶ 18 Likewise, in *Bradley*, the operating company admitted that "killing" a well was not part of the operator's day-to-day activities. In addition, the service company had to have specialized equipment to "kill" the well. In that case, the operating company was not a principal employer.

¶ 19 Returning to the *Murphy analysis*, the Supreme court stated:

> If the contractor, however independent he may be, is merely a medium through whom the hirer is pursuing the day-to-day activity of his own business, § 11 status is created by operation of law and compensation liability attaches.

611 P.2d at 244–245.

¶ 20 Thus, it is clear that the Supreme Court would hold a hirer liable as a statutory employer where the hirer contracts the core activities of the hirer's business to an independent contractor such as the facts demonstrate in the instant case.[3]

¶ 21 Applying the legal principles discussed to facts at bar, we conclude that summary judgment was properly granted in favor of Timberbrook Homeowners Association. AFFIRMED AND REMANDED.

MITCHELL, J., concurs, and ADAMS, J., dissents with separate opinion.

ADAMS, J., dissenting.

¶ 1 I believe the majority too narrowly considers the trade or business in which Timberbrook is engaged. In the process, my colleagues overlook the necessity of some evidence that Timberbrook or others engaged in a similar business typically use their own employees to perform the services which

---

**3.** See *Clayco Construction v. Beserra,* 1998 OK CIV APP 72, 962 P.2d 671 (cert.denied) where a broker for roofing contractor was found second-arily liable for workers' compensation for injuries to employee of his subcontractor.

Swim Management performed under its contract with Timberbrook.

¶ 2 If the analysis employed by the majority here had been applied in *Bradley v. Clark,* 1990 OK 73, 804 P.2d 425, the Oklahoma Supreme Court would have been forced to conclude that the well operator was in the business of repairing oil wells. However, the Court did not focus on the precise task for which the contractor was hired but looked at the broader business in which the well operator was engaged. A similar analysis is appropriate here.

¶ 3 For purposes of the "three-tier test" recognized in *Bradley,* Timberbrook was engaged in the general business of maintaining and operating the common areas of a residential development. In order to conduct that business it had to be certain that the pool was operated and maintained properly, much as the well operator in *Bradley* had to be certain that the well was properly functioning and in good repair. The *Bradley* Court properly considered evidence concerning whether the well repair was the type of work which was necessary to the well operator's business *and* which the well operator or others like the operator would typically have performed by employees of the operator.

¶ 4 I would apply that same analysis here. The record contains no evidence bearing on whether Timberbrook has ever hired its own employees to maintain and operate the pool or whether other homeowners' associations or other entities whose primary business is the maintenance and operation of common areas for residential purposes typically do so. Therefore, in my opinion, summary judgment was inappropriate on this record, and I respectfully dissent.