2008 OK CIV APP 55

**ARVEST BANK, Norman, Oklahoma, Plaintiff/Appellant/Counter Appellee,**

v.

**SPIRITBANK, N.A., Defendant/Third Party Plaintiff/Appellee/Counter Appellant,**

and

**Oliver Auto Group, Inc., and David G. Oliver, Defendants/Third Party Plaintiffs,**

v.

**Trac's Sports & Imports, Inc. and Citizen's Bank of Edmond, Third Party Defendants.**

No. 103,709.

Court of Civil Appeals of Oklahoma, Division No. 1.

May 16, 2008.

As Corrected May 23 and Sept. 11, 2008.

Thomas J. Blalock, John B. Jenkins, Commercial Law Group, P.C., Oklahoma City, Oklahoma, and John W. Swinford, Jr., John W. Swinford, Jr., P.C., Oklahoma City, Oklahoma, for Arvest Bank.

John M. Coffey, James U. White, Jr., White, Coffey & Fite, P.C., Oklahoma City, Oklahoma, for SpiritBank, N.A.

## OPINION

ADAMS, Presiding Judge.

¶ 1 After the trial court entered an order granting Arvest Bank (Arvest) and SpiritBank, N.A. (Spirit) only part of the relief each had requested, Arvest filed an appeal and Spirit filed a counter appeal. Each argued that the other was not entitled to relief because the trial court had erred in its determination as to the priority of and existence of security interests in proceeds from automobiles when applying the provisions of the Uniform Commercial Code (UCC) adopted in Oklahoma. We agree that the trial court

erred in failing to apply the law for the priority accorded depositary banks as to proceeds traced by Spirit which were attributable to sales prior to the appointment of a receiver and reverse that portion of the judgment. As to the proceeds from sales conducted under court orders by the receiver, Spirit's security interest has priority over that of Arvest, and the award to Arvest of proceeds from the sales of these cars also must be reversed. The matter is remanded to the trial court for the entry of appropriate orders.

¶ 2 This controversy arises from the operation of the used luxury automobile dealership Oliver Auto Group (OAG) formed by David Oliver (Oliver) in 1996. That same year, Allen Randall Trachtenberg (Trachtenberg) began operation of Trac's Sports and Imports (TSI), another licensed used car dealership. Arvest extended financing to OAG on March 22, 2002, under what is commonly referred to in the car industry as a flooring agreement, floor plan or floor plan agreement and filed a financial statement that same day to perfect its security interest in OAG's inventory and in other assets. Prior to the start of Arvest's floor plan for OAG, TSI had placed cars on OAG's lot on a consignment basis, a sales method Trachtenberg testified was also used at other automobile sales lots. TSI had a floor plan with Spirit which was secured by its accounts and other property, including its car inventory.[1]

¶ 3 By the fall of 2002, OAG was in default on its note. Arvest sued OAG, Oliver, and Spirit on November 22, 2002, claiming OAG was in default on the note and asking for relief including an injunction, replevin and the appointment of a receiver. In December of 2002, Spirit answered and filed a counter petition claiming that it had a perfected security interest in various automobiles on OAG's lot which had been consigned there by its debtor, TSI, and asked for the automobiles or any proceeds from their sales. Spirit also joined TSI as a third party defendant, claimed a security interest in TSI's cars, and sought to collect proceeds from sales of those cars.

¶ 4 Restated, both Arvest and Spirit claim to either hold a security interest which predominates over one held by the other or to be entitled to proceeds from the sales of cars because the other's security interest had either failed to attach or had lapsed.[2] The basic underlying facts are not at issue, but the legal effect of the transactions is disputed.

¶ 5 The parties stipulated that (1) TSI's loans with Spirit began in 1999, and were renewed periodically thereafter; (2) TSI's credit line with Spirit increased from $100,000 to $450,000 and the last renewal was in the principal sum of $395,446.91; (3) Spirit "properly perfected its security interest" by filing a financing statement with the Oklahoma County Clerk on December 1, 1999; (4) the last renewal of TSI's loan with Spirit, on June 30, 2003, includes indebtedness for advances to TSI for cars at issue in the litigation; (5) Trachtenberg, the "sole shareholder and director" of TSI, signed a personal guarantee of the debt to Spirit; (6) OAG sold cars to TSI and that Paul Harlin Farmer (Farmer) "acting on behalf of [TSI], requested advances upon the [Spirit] line of credit"; (7) Spirit advanced funds for TSI to purchase cars from OAG and titles for the cars were delivered to Spirit; and (8) when TSI cars were sold, either Farmer or another named OAG employee would obtain titles from Spirit using "trust receipts signed as agent for [TSI]." They also stipulated that Spirit

---

1. Arvest's floor plan applies to collateral "whether now owned or hereafter acquired" including inventory and "all additions and accessions to, replacements of, substitutions for and proceeds from" any of the listed collateral items. Spirit's floor plan similarly states it applies to inventory "now owned or hereafter acquired, and all additions, accessions and substitutions thereto and therefor" and "[a]ll proceeds and products of the foregoing."

2. The cars at issue, referred to as Pre–Litigation Cars and Post–Litigation Cars, were classified based upon whether they were sold prior to or after Arvest filed suit against OAG, not upon when floor plan financing was extended by Arvest or Spirit. We adopt those same labels for purposes of our analysis.

"would have a security interest in the [cars] as well as the sale proceeds."

¶ 6 The parties further stipulated that (1) OAG, by and through Oliver, entered into "a $2.5 Million floor plan financing agreement" with Arvest "[o]n or about March 22, 2002"; (2) Oliver signed a personal guaranty for the Arvest loan; (3) the Arvest loan proceeds paid off other banks and consolidated OAG's floor plan financing with Arvest; (4) Arvest's loan agreement required the monthly submission of Borrowing Base Certificates to it; (5) Arvest's advances were determined by a formula stated in the Borrowing Base Certificates; (6) those certificates were delivered to Arvest for the months of March through October, 2002; and (7) Oliver executed all of the Borrowing Base Certificates.

¶ 7 The parties also stipulated that (1) a receiver was appointed to account for and to liquidate OAG's car inventory; (2) the inventory was liquidated; (3) "the cash that is claimed by Spirit is on deposit pending a determination of entitlement to those proceeds"; (4) that nine of the listed "Subject Vehicles" were sold prior to the appointment of the receiver and were not sold by the receiver; and (5) "[s]ubsequent to the receiver's appointment, [Spirit] discovered that the Subject Vehicles, which were subject to its security interest, had been sold by OAG and the proceeds not paid to [Spirit]."

¶ 8 The cars called "Subject Vehicles" in the stipulation include the eight cars later denominated as the Pre–Litigation Cars during the litigation and nine cars later sold by the receiver and identified as the Post–Liti-

gation Cars.[3] The parties each claimed entitlement to $267,922 in proceeds from the sales of these seventeen cars.

¶ 9 Pursuant to a December 30, 2004 agreed order, proceeds from the receiver's sales, after deducting certain fees and expenses, were deposited with either Arvest, Spirit, or Citizens Bank of Edmond (Citizens) subject to a right to object and to file by a certain date a motion to recover any proceeds in which the party claims a prior perfected security interest or claim.

¶ 10 The trial court concluded that Spirit was entitled to $143,522 and Arvest was entitled to $124,400. The judgment contains specific findings as to each of the seventeen cars' proceeds and determines Arvest is entitled to proceeds of $51,300 from the Pre–Litigation Cars and $73,100 from the Post–Litigation Cars, and Spirit Bank is entitled to proceeds of $128,622 from the Pre–Litigation Cars and $14,900 from the Post–Litigation Cars. The journal entry states that Spirit is entitled to judgment *in rem* against TSI and is not barred by a settlement between TSI and Spirit from pursuing its rights to collect the debt through the collateral. After adjusting for the proceeds each bank held, a $55,522 judgment in favor of Spirit and against Arvest was entered. The appeal and counter appeal followed.[4]

¶ 11 Arvest claims that the underlying facts are not in dispute but that the operative effect of those facts and the legal conclusions applied to them are at issue in its appeal. It argues the trial court did not properly interpret applicable provisions of Oklahoma's

---

**3.** According to the stipulated dates, seven of the financing transactions for the nine cars occurred before and two occurred after the Arvest floor plan. The ninth car was financed by Spirit, Oliver sold the car, and OAG had received payment from and transferred title to the purchaser before the Arvest floor plan. According to the trial court judgment, Spirit dropped any claim as to this car, which had been originally identified as Pre–Litigation Car 1.

**4.** After briefing had been completed and assignment to this Court, we noted the absence of any order resolving Arvest's claim against David G. Oliver, and we issued an order questioning

whether this appeal was premature. In subsequent filings, both parties conceded that Arvest's claim against Oliver in this case had not been resolved and that the trial court's order would not be final until that claim was resolved. We granted leave for the parties to proceed in District Court to dismiss the claim against Oliver, which was done. Arvest filed a timely amended petition in error, and Spirit filed a timely amended counter-petition. This development obviates any consideration of Arvest's argument that Spirit's counter-appeal was not timely commenced initially.

UCC, 12A O.S.2001 § 1–101, *et seq.* Spirit's appeal likewise is dependent upon the legal effect of the facts.

## STANDARD OF REVIEW

¶ 12 When the facts shown by the evidence are not in dispute, an appeal presents only a question of law. *Baptist Building Corporation v. Barnes,* 1994 OK CIV APP 71, 874 P.2d 68. Questions of law are reviewed by a *de novo* standard. *Bank of Wichitas v. Ledford,* 2006 OK 73, 151 P.3d 103. That is, the appellate court has the plenary, independent and non-deferential authority to re-examine a trial court's legal rulings. *Neil Acquisition, L.L.C. v. Wingrod Investment Corporation,* 1996 OK 125, 932 P.2d 1100. The appellate court independently reviews questions of law because it is its role to define the law. *Matter of Estate of Crowl,* 1987 OK 13 737 P.2d 911.

¶ 13 The court's findings in a non-jury trial are entitled to the same weight and consideration as would be given to a jury's verdict. *Soldan v. Stone Video,* 1999 OK 66, 988 P.2d 1268. The trial court's fact determinations in such a trial bear the same force as determinations by a well-instructed jury and will be sustained if supported by any competent evidence. *Bradley v. Clark,* 1990 OK 73, 804 P.2d 425.

## ANALYSIS

¶ 14 In its appeal, Arvest claims entitlement to all the proceeds from the sales of all the cars based on its security agreement with OAG. Arvest argues that the trial court erred in entering judgment *in rem* in favor of Spirit because all its claims against TSI were premised upon debts extinguished by a Set-

tlement Agreement and a dismissal with prejudice which operated as a retraxit and effected a judgment against TSI. Arvest also argues that TSI was not a buyer in the ordinary course of business and that as a consequence, its own security interest survived. It also claims a right to offset the debt owed it against OAG's purchase account, which included proceeds from the sales of cars. Spirit seeks both proceeds from the receiver's sales and to trace proceeds from earlier sales of the Pre–Litigation Cars. Spirit claims that Arvest's security interest terminated when it consented to sales and received payment for those cars. The rights of the parties as competing secured creditors present interrelated and competing considerations. We address the arguments by topic.

### The Effect of the Spirit Bank Settlement Agreement

█ ¶ 15 Arvest claims the trial court erred in granting Spirit relief because on October 24, 2004, TSI, Trachtenberg, and Spirit[5] entered into a written settlement agreement which released TSI and Trachtenberg from liability to Spirit "in exchange for certain payments and assignments." The Settlement Agreement also states that TSI and Trachtenberg released their claims against Spirit and assigned to Spirit "any and all claims" against Arvest, OAG, and Oliver, including any claims "in connection with the collateral associated with" Spirit's and Citizens' loans.

¶ 16 According to the Settlement Agreement, $416,979.55 was owed Spirit on its note with TSI. Spirit was paid $128,721.23, and on December 8, 2004, Spirit dismissed its claims against TSI with prejudice to refiling.[6]

---

**5.** Citizens also participated in the settlement and later modification. It received a payment, was released by Trac's and Trachtenberg, was assigned their claims, and released its claims against them. Also assigned to Spirit and Citizens were any claims against an underwriter not named in this appeal. On October 4, 2005, Citizens filed a withdrawal of its claims for recovery of any proceeds in the litigation based upon cars owned by Trac's, released and terminated its

July, 2001 UCC financing statements, and informed the trial court it had settled with Arvest. For the discussion herein, we need make no note of the Settlement Agreement terms referring to Citizens.

**6.** Arvest filed a motion for summary judgment, arguing that the settlement extinguished any basis for a judgment. The parties filed briefs, but the docket does not contain any notations indi-

¶ 17 The parties to the settlement signed a MODIFICATION OF SETTLEMENT AGREEMENT on June 3, 2005, "to clarify their intention" and to provide that substituted text in the modification was "effective as if originally contained in the Settlement Agreement." The substituted text provided that (1) only personal liability of TSI and Trachtenberg for the debt owed Spirit would be released upon the assignment of their claims, (2) the payments received were "only in partial satisfaction of the debt and obligation" owed Spirit and "not in full satisfaction of the debt and obligation," and (3) the parties to the Settlement Agreement intended that Spirit retain a right to enforce or collect on the debt by "proceeding *in rem* against [TSI and Trachtenberg]" based on property rights created under the loan with Spirit.

¶ 18 Arvest claims that these modifications came too late, and that the settlement served to release any liability by TSI, which it argues served as the basis for Spirit's claims, and operated as a final judgment on the merits. Spirit claims that the law favors settlements and recognizes the separate nature of *in personam* and *in rem* rights. Spirit likens its settlement with TSI to that in *Rutledge v. Verdigris Valley Economic Development Corporation, Inc.*, 186 B.R. 517 (Bankr.N.D.Okla.1995), a case in which personal liability was extinguished but the creditor retained the ability to pursue rights in collateral under assigned security documents.

¶ 19 Arvest argues that case is distinguishable in that it turned on the assignment of a revolving line of credit with a future advance clause and the bankruptcy court's holding that the security document survived was dependent upon advances made after the assignment, a factor not present here. We agree that the case is distinguishable, but do not find this determinative of the issue whether the agreement here served to extinguish Spirit's right to proceed *in rem*.

■ ¶ 20 "It is characteristic of a judgment in rem that it operates on a thing or status rather than against the person, and binds all persons to the extent of their interest in the thing whether or not they were parties to the proceedings," 50 C.J.S. Judgments § 1054, p. 658, and that it "operates only on the property which is the subject of litigation." 50 C.J.S. Judgments § 1057, p. 660. Whether a judgment is *in personam* or *in rem* depends upon the character of the action. The character of an action is determined by the nature of the issues framed by the pleadings and the rights and remedies of the parties, and not solely by the form in which the action is brought or by the prayer for relief. *Comstock v. Little*, 1961 OK 35, 359 P.2d 704; *Green v. Correll*, 1928 OK 501, ¶ 0, 133 Okla. 94, 271 P. 241. In addition, the court must interpret a contract so as to give effect to the mutual intent of the parties at the time the contract was formed, 15 O.S. 2001 § 152, and may be explained by reference to both the circumstances under which it was made and the matter to which it relates. 15 O.S.2001 § 163.

¶ 21 Spirit points to portions of the original text in the settlement requiring TSI and Trachtenberg to execute assignments of their claims against OAG, Oliver, and Arvest, and for them to participate in and cooperate with Spirit in the litigation as indicating an intent to only release *in personam* liability. A plain reading of the terms of the agreement shows that it calls for TSI to assign to Spirit its rights to proceed against Arvest, OAG, and Oliver regarding the subject of suit. The subject of the lawsuit was the parties' respective rights in collateral and proceeds from that collateral. TSI's and Trachtenberg's agreement to participate in the litigation against Arvest, OAG, and Oliver would be superfluous if the agreement did not intend to assign the right to pursue the collateral or its proceeds, *in rem* rights.

¶ 22 Looking at the character of the matter as a whole, we conclude that TSI's claims, and later Spirit's claims, against Arvest did

cating a ruling on the motion for summary judgment prior to the trial commencing in September of 2005. The judgment entered following trial contains a finding that Spirit is not barred from

pursuing its remedies because the Settlement Agreement does not limit its *in rem* rights to collect its debt through the collateral.

not seek to establish personal liability for a debt but to determine entitlement to specific collateral. Such an action to determine the status of and entitlement to property was *in rem.*

■ ¶ 23 The later modification of the settlement may have made clearer *to others* what occurred, but it did not alter the parties' original agreement that TSI [7] would assign its rights to Spirit. The intention of the parties to the settlement, as with any written contract, must (1) be ascertained, if possible, from the writing, 15 O.S.2001 § 155, (2) taken as a whole so as to give effect to every part and using each clause to help interpret the others, 15 O.S.2001 § 157, and (3) interpreted so as to make it capable of being carried into effect without violating the intention of the parties. 15 O.S.2001 § 159.

¶ 24 That being so, there was no intent to discharge the entire rights and liability under the Spirit floor plan, and the parties to the Settlement Agreement agreed that the right to proceed against the collateral for the loan, that is, to proceed *in rem,* was to be assigned to Spirit. There is no dispute that an assignment was executed pursuant to the settlement. The trial court did not err in concluding that Spirit could pursue rights *in rem.*

### The Pre–Litigation Cars

■ ¶ 25 Arvest argues that the award of proceeds to Spirit from the sales of Pre–Litigation Cars must be reversed because its interest in OAG's deposit accounts is superior to Spirit's claim to any traced proceeds. Arvest argues that OAG owed it more than the sum in OAG's deposit accounts, at the time OAG's business ended those accounts were actually in the negative, and as a depositary bank it is entitled to recoupment or setoff against OAG's account with it, especially since Spirit lacked any control agreement over the proceeds.

¶ 26 Spirit argues that it had a prior perfected security interest in six of the Pre–Litigation Cars, it is entitled to trace proceeds from the sales of those cars into Arvest's hands, and that the judgment awarding those proceeds to it is not erroneous. Using tracing as a basis, Spirit also argues Arvest is estopped from retaining proceeds used by OAG to purchase additional inventory. Spirit's claim to the proceeds arises from both the provisions of its floor plan with TSI covering after acquired property and from the early filing of its financial statement. At first blush these factors appear to militate for judgment in Spirit's favor, but the terms of its floor plan and filing of its financial statement are not decisive under the facts of this dispute.

¶ 27 As the Oklahoma Comments to 12A O.S.2001 § 1–9–340 note, that section, enacted in 2001, "changes the prior rule in Oklahoma and many other states that a bank's right of setoff against a deposit account could be subordinate to a prior perfected security interest tracing proceeds into such deposit account." This is consistent with the view under common law that the funds deposited with a bank belong to the bank and that any account balance represented the bank's indebtedness to the depositor.

¶ 28 As to funds deposited by OAG into its Arvest account from the Pre–Litigation Car sales, § 1–9–340 allows Arvest a right of recoupment or setoff which has priority over any prior perfected security interest of Spirit. A security interest held by a bank with which a deposit account is maintained has priority over conflicting security interests held by other secured parties. 12A O.S.2001 § 1–9–327(3). The security interest of a party having control of a deposit account has priority over conflicting security interests of those lacking such control. 12A O.S.2001 § 1–9–327(1). Effective July 1, 2001, as the Oklahoma Comments to 12A O.S.2001 § 1–9–327 state, the former priority rules in Oklahoma changed, and a depositary institution may "achieve priority over competing secured parties tracing the proceeds of their security interests into the deposit account."

---

7. Trachtenberg, as a guarantor of the loan, would not be said to have claims to the consigned property, *i.e.,* his claims are not *in rem.*

However, as to TSI, the claims in the litigation against Arvest, OAG and Oliver regarded the status of the consigned property itself.

¶ 29 Arvest points to the lack of any control agreement in favor of Spirit in OAG's deposit accounts as confirming its priority in the deposit accounts, and argues that Spirit could not assert an interest in the deposit accounts when Arvest exercised its right of setoff or recoupment. Section 1–9–327 settles this issue in favor of Arvest. Spirit's tracing of proceeds is for naught here because Arvest had control as defined in 12A O.S.2001 § 1–9–104. Having determined Arvest's right to the proceeds placed in the deposit account by OAG based upon Arvest's status as a depositary bank, we need not further comment on the effect of Spirit's lack of a control agreement or upon whether or not a 20–day period applied to the perfection of security interests in proceeds.

¶ 30 The trial court found that Arvest had received proceeds attributable to eight Pre–Litigation Cars but that Spirit was entitled to the proceeds from six of those cars. That finding must be reversed. Arvest, as a depositary bank with control of OAG's account, had the right to recoup or offset the proceeds deposited against the obligation owed it by OAG and will not be required to disgorge any portion of that amount *via* tracing for proceeds deposited into OAG's accounts from sales prior to those conducted by the receiver, that is, those attributable to sales of the Pre–Litigation Cars. The award to Spirit based upon tracing into OAG's accounts with Arvest proceeds from sales of the Pre–Litigation Cars is reversed.

### The Post–Litigation Cars

■ ¶ 31 A different analysis applies to the proceeds attributable to the Post–Litigation Cars.[8] The parties to the litigation agreed to the appointment of a receiver and of a method to raise objections to the good faith determinations by the receiver as to which entity was entitled to what sales proceeds. Each of them filed such objections. The proceeds from the Post–Litigation Cars were generated solely by sales by the receiver and the proceedings were disbursed, subject to that right to object, pursuant to court orders. The right of recoupment or setoff has no application to the funds generated by sales made by the receiver. We must instead examine the apparent legal basis for trial court findings as to entitlement to the Post–Litigation Car proceeds.

¶ 32 Arvest argues that Spirit is not entitled to proceeds because the OAG–TSI sales did not qualify as sales to a buyer in the ordinary course of business and Spirit's security interest consequently lacks priority over its own security interest in OAG's inventory under its flooring agreement. Arvest also argues the sales do not qualify as dealer-to-dealer sales in the ordinary course of business.[9]

¶ 33 Other than in the case of exceptions not applicable here, a buyer of goods who is "a buyer in ordinary course of business ... takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence." 12A O.S.2001 § 1–9–320(a). The UCC identifies a "buyer in ordinary course of business" as one who "buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person ... in the business of selling goods of that kind" and only a buyer who "takes possession of the goods" or have "a right to recover the goods from the seller" may so qualify. 12A O.S.2001 § 1–201(9). A person buys "in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own

---

8. Having determined that Arvest's depositary bank rights dispose of claims to the proceeds of Pre–Litigation Cars, our analysis hereafter concerns only the law as it applies to facts concerning the Post–Litigation Cars.

9. Arvest's citation to *12A O.S.2001 § 1–9–325(a)(1)*, which addresses the priority of security interests in transferred collateral, does not settle the matter; it begs the question because that section applies if a debtor "acquired the collateral subject to the security interest created by the other person," and whether or not TSI acquired cars subject to Arvest's security interest is the issue to be determined.

usual or customary practices." 12A O.S.2001 § 1–201(9).

¶ 34 The judgment contains no explicit finding that TSI was not a buyer in the ordinary course of business, but Arvest claims that such a finding must be presumed because of the judgment in its favor concerning cars purchased after the start of its floor plan. Arvest argues that "[a]n ordinary course transaction must be a transaction which is ordinary and not illegal in the industry as well as ordinary in the seller's business and ordinary in the buyer's business." In addition, Arvest cites *Rudiger Charolais Ranches v. Van De Graaf Ranches*, 994 F.2d 670 (9th Cir.(Wash.), 1993), for the proposition that an industry custom in direct conflict with a statute will not be enforced. Using these criteria, Arvest argues that OAG's failure to timely transfer titles into TSI's name in fulfillment of title requirements in Title 47 prevented the transactions from qualifying as dealer-to-dealer transactions in the ordinary course of business.

¶ 35 Spirit claims it was a buyer in the ordinary course of business and that it is widely known dealers "transfer, trade and sell automobiles among themselves as a matter of convenience," citing *P & E Finance Company v. Stonecipher*, 1963 OK 246, 386 P.2d 765. Arvest claims that Spirit's reliance on *Stonecipher* is misplaced because that dispute was decided under the prior chattel mortgage statute and its events occurred prior to the enactment of the UCC. *Stonecipher* is not so easily dismissed nor is its analysis irrelevant.

¶ 36 Oklahoma Comments to § 1–9–320 advise that the revisions to that section required a buyer to "take *or have a right to possession of the collateral*" to receive protections under it and that "[f]or the buyer to be protected, the sale does not have to be at retail. Sales between dealers, where otherwise in the normal course of business, will be included. *This continues prior law. P & E Finance Co. v. Stonecipher*, 386 P.2d 765 (Okl.1963)." (Emphasis added within both quotations.) Here, the survival of Arvest's

security interest is at issue, but there is no dispute that TSI had a right to the possession of the cars, although it had agreed to leave them on OAG's lot on consignment. Arvest's claim as to the inapplicability of *Stonecipher* must be rejected. However, questions remain whether the sales here were "in the normal course of business" and whether that requirement applies here.

¶ 37 Arvest does not argue that a transfer of ownership may not have occurred, only that the dealer-to-dealer transactions could not be considered as occurring in the ordinary course of business and that consequently its security interest continued. *See* 12A O.S.2001 § 2–401(2). Arvest argues its security interest survives sales from OAG to TSI because those sales were not made in the ordinary course of business, claiming that "[i]f a buyer does not meet the criteria laid out in 12A Okla. Stat. § 1–9–320, the security interest created by the seller continues in the goods. 12A Okla. Stat. § 1–9–315." Spirit argues that not only were the sales dealer-to-dealer transactions customary within the business but also that it perfected a security interest in after-acquired inventory such as the cars TSI purchased from OAG prior to the inception of Arvest's floor plan. Further, as a result of either consent or payment, Spirit argues, the trial court erred when awarding Post–Litigation Car proceeds to Arvest.

¶ 38 A security interest continues in collateral notwithstanding its sale "unless the secured party authorized the disposition free of the security interest." 12A O.S.2001 § 1–9–315(a)(1). As Comment 6 to § 1–9–320 states, the limitation regarding a buyer in due course imposed in § 1–9–320(a) applies "only to *unauthorized* sales by the debtor. If the secured party authorized the sale in an express agreement or otherwise, the buyer takes free under Section 9–315(a) *without regard to the limitations of this section.*" (Emphasis added.) *Accord, First Bank of Okarche v. Lepak*, 1998 OK 46, 961 P.2d 194, (applying former law, now carried forward in § 1–9–315, which held that a secured party destroys its security interest by authorizing disposition of collateral).

¶ 39 Arvest's criticism [10] of the transfer and consign arrangement between TSI and OAG makes note of the financing by Spirit but fails to fully consider the treatment of the payment of the sale funds received from OAG under the precise wording of its own flooring agreement. Arvest's argument that its loan to OAG is an "inventory loan" and that as a consequence its security interest must continue in all the cars sold to TSI neglects to give effect both to how the express language in Arvest's loan agreement concerning the borrowing base requirement that cars must be *"paid off and removed"* from the inventory serving to secure OAG's loan and to its knowledge at the outset that OAG planned to use TSI's floor plan with Spirit.[11]

¶ 40 The statement of facts in Arvest's brief in chief advances an explanation that "[u]nder the loan covenants OAG made to Arvest, the value [of] any inventory that had not sold within 180 days would be *excluded from* the calculation of the borrowing base" and that OAG was "required to either increase the value of the borrowing base (by adding fresh inventory) or to pay down the Arvest Loan." (Emphasis added.) This is a very loose explanation of the loan text. Nowhere does the loan refer to a duty to "pay down" the loan attributable to cars still held at 180 days.[12] What the agreement states is that such cars must be *"paid off and removed"* from the borrowing base after 180

days. Nothing on the face of the words used implicates an ambiguity or any technical or special meaning. This requirement was created by the Arvest-drafted loan documents, not because of any business practices, whether initially or post-floor plan, by OAG, and the words of the contract are to be understood in their ordinary and popular sense. 15 O.S.2001 § 160. It is nonsensical to claim that the agreement between Arvest and OAG requires that collateral must not only be paid off but also must be removed from the basis used to secure a loan, yet a security interest in that sold collateral should continue thereafter.

¶ 41 Arvest argues OAG and TSI "fundamentally" changed their arrangement and that this changed TSI from a consignor to a lender. We must reject this claim given that OAG's loan request in its business plan states that it "has a substantial consignment arrangement with [TSI]," and both the loan request and Arvest's own Loan Proposal/Credit memorandum state that OAG's loan proposal "contemplates [OAG's] purchase" of $585,000 of TSI's $1 million dollar total in floor plans, and describes a flat monthly fee and interest payment arrangement [13] which Arvest appears to be arguing was a fundamental alteration.

¶ 42 Contrary to Arvest's claim that the sales are "sham bookkeeping transactions orchestrated by OAG's and TSI's common

10. In its briefs Arvest refers to the OAG–TSI sales as a "charade," alleges that Farmer "laundered" cars through the transfer and consign transactions, and repeatedly calls the transactions "sham." Clearly, Arvest finds fault in the OAG–TSI transactions, but the Court is quite capable of determining the effect of the transactions and such characterizations, while colorful, do not advance legal analysis of the priority arguments.

11. Arvest's argument regarding a change in how OAG paid TSI relates to a business risk factor. The power to implement controls for any risk posed by the consigned cars rested with it as a lender. Arvest's loan to OAG was made with knowledge OAG would use TSI's floor plan with Spirit, and it did so, generating the funds TSI paid OAG.

12. The loan agreement also provides that "[t]he lapse time between the time of a unit sale by

[OAG] and repayment will not exceed seven (7) business days." The loan terms required the advance amount for all floored cars not to exceed the lesser of its purchase price or trade-in value plus an additional buyer's fee. Floored cars are required to have a minimum floored value. None of the cars at issue here were worth less than the $5,000 limit which required cars to be removed from the borrowing base within 30 days.

13. The only alteration of payment in the TSI–OAG relationship was described as a change from a 50/50 profit split to a flat fee of $2,000 per month plus interest and insurance expenses, with OAG retaining any profit from the sale of a consigned vehicle. The OAG business plan seeking the Arvest financing describes this later arrangement, *not* the earlier one.

agent," it is undisputed that Spirit, *via* its debtor TSI, gave value for the cars and they were removed from the collateral used to secure OAG's loan pursuant to the terms of the loan agreement.[14] Whether TSI qualified as a buyer in the ordinary course of business is not determinative here because the sales of cars were consented to and were, after 180 days, required by Arvest, presumably to assure the disposal of stale collateral.

¶ 43 Arvest also points to OAG's failure to timely assign titles to TSI as demonstrating that the sales by OAG to TSI could not be considered as in the ordinary course of business or commercially reasonable because criminal acts may not so qualify. Trachtenberg testified that initially the cars consigned to OAG were titled in his name or TSI's name, but that later, it was a "matter of convenience" not to transfer all the titles into his or TSI's names "because this thing was a[sic] burdensome" based upon the size of the line of credit. Instead, titles were left in OAG's name after sales to TSI. Arvest points to this failure as indicating the sales were sham. It does not explain how the failure to comply with statutory requirements that a seller assign a certificate of title makes the transactions "sham," especially as between the seller and buyer, in light of its receipt of proceeds from those transactions and surrender of titles upon receiving the funds derived from Spirit's floor plan. It also contradicts its own admission that title to the cars passed as a result of the transactions.

¶ 44 Arvest argues Spirit errs in citing *Al's Auto Sales v. Moskowitz,* 1950 OK 94, 203 Okla. 611, 224 P.2d 588, in support of its buyer in due course status because the matter predated the enactment of the UCC. The *Moskowitz* Court found that one dealer buying from another was an innocent purchaser for value despite the seller's violation of statutory license and registration requirements by failing to deliver title to the buyer. Spirit claims that later statutory changes making certificates of title evidence of ownership did not negate the intent under prior law because *Moskowitz* was relied upon in *Medico Leasing Company v. Smith,* 1969 OK 114, 457 P.2d 548, which explained that the purpose of the title delivery requirements in motor vehicle statutory schemes is to protect the public against theft, facilitate recovery of stolen automobiles, and aid the state in enforcement of its regulation of motor vehicles, not to protect secured creditors. Spirit cites *Foy v. First National Bank of Elkhart,* 868 F.2d 251, 255–256 (7th Cir.1989), to similar effect.[15]

¶ 45 Oklahoma law does reflect an intent to protect secured parties in that in 47 O.S.2001 § 1110(A)(5), the Legislature has provided that "[a]ny person creating a security interest in a vehicle that has been previously registered in the debtor's name" and on which the taxes and fees have been paid "shall surrender the certificate of ownership to the secured party" who then "shall have the duty to record the security interest . . . and shall, at the same time, obtain a new certificate of title which shall show the secured interest on the face of the certificate of

14. Farmer testified that: (1) cars nearing the 180–day limit were sold and additional collateral was then provided for the borrowing base with Arvest; (2) he constructed the monthly borrowing base certificates provided to Arvest listing the year, make, inventory number, value, and the last eight characters of the motor vehicle number for each car; (3) in his records for OAG he identified each car on the Arvest borrowing base by a separate number for that advance; (4) when TSI bought a car it wrote OAG a check and he deposited it in OAG's purchasing account; (5) he then wrote Arvest a check from OAG's account upon which he put a reference to the specific number for the car sold to TSI; and (6) Arvest then released the car's title and he took it to Spirit and received a loan advance from them for TSI's account. He denied "swapping" titles for cars, and testified that "[t]here was always checks exchanged" in sales between OAG and TSI. Trachtenberg testified his authorization was required for advances on Spirit's floor plan, Farmer did the paperwork on transactions "as a matter of convenience" because it was "burdensome based on a $450,000 line of credit," and that TSI did not compensate Farmer.

15. That decision's analysis of a secondary purpose of title delivery statutory schemes-helping to protect floor plan lenders' security interests by making it more difficult for borrowers to re-sell without notice to the banks-does not apply under the facts here. Here, car title documents were surrendered to Arvest by OAG and, following the sales to TSI, to Spirit.

title." Arvest had title certificates in its possession but it released them upon receiving payment from OAG.

¶ 46 Subsection C of § 1107 makes violation of that section a misdemeanor, imposes a fine, and provides for the impoundment of a vehicle until applicable taxes and fees are paid. Section 1107 also requires the transferee of a motor vehicle to deliver within 30 days the assigned certificate of title and an insurance verification form to the Oklahoma Tax Commission or one of its agents, but that section applies to transfers *"unless* such person is a bona fide used motor vehicle dealer licensed by this state." 47 O.S.2001 § 1107(A). (Emphasis added.)

¶ 47 The perfection provisions of Title 47 provide that security interests in cars held by dealers are governed by Title 12A, not the provisions of Title 47. *See, e.g.,* 47 O.S.2001 § 1110(A). According to § 1110(A), delivery of a lien entry form to the Oklahoma Tax Commission or a motor license agent is required to perfect a security interest in a vehicle "[e]xcept for a security interest in vehicles held by a dealer," and the filing and duration of security interests pursuant to Title 12A are inapplicable "except as to vehicles held by a dealer for sale or lease," and Title 12A applies "[i]n all other respects" to security interests.

¶ 48 However, the analysis of the impact of OAG's failure to comply with requirements in Title 47 is only applicable here to an analysis of whether TSI took title to cars curtailed by OAG as a buyer in the ordinary course of business so as to cut off Arvest's security interest in the cars. As discussed above, under the evidence developed in the record for this matter, that requirement did not apply to prevent TSI from acquiring title unfettered by an Arvest security interest. The business practices which were employed by Farmer for transactions between OAG and TSI may be subject to criticism, but the party to seek relief *via* a penalty for any violation of the title certificate statutes is the State, not a party seeking to enforce a security interest. As Title 47 makes clear, as to

security interests in cars held by car dealers, rights are governed by other law, especially Title 12A.

¶ 49 Arvest argues that because its security interest in OAG's inventory was perfected on March 22, 2002, and it had "subsequently acquired for value all of Spirit's former security interests in OAG inventory" that its date of perfection related back to a January 26, 2000 filing. Under a "first in time" analysis, Arvest does not prevail. Spirit filed its financial statement perfecting its security interest in TSI's inventory, including after-acquired property, and Arvest knew that TSI's property was present on OAG's lot and Spirit had its own floor plan for that property.

¶ 50 Spirit's financing statement for TSI's floor plan was filed December 1, 1999. Arvest's financing statement for OAG's floor plan was filed on March 22, 2002. However, Spirit also had loans with OAG which were assigned to Arvest on January 13, 2003, after commencement of the litigation. Spirit's December 4, 2001 financing statement for those loans covers "All Inventory now owned or hereafter acquired and wheresoever located together with all proceeds from the sale thereof." Arvest claims priority under an earlier financing statement included in the assigned documents, filed on January 26, 2000, but that financing statement described only "One (1)" double-sided incandescent message center "and all related accessories and computer equipment," not inventory. A description of property is sufficient if it reasonably identifies what is described. 12A O.S.2001 § 1–9–108(a), *see also* 12A O.S.2001 § 1–9–502(a)(3) and 12A O.S.2001 § 1–9–504. The description in the January 26, 2000 financing statement does not reasonably describe inventory and fails for the perfection of OAG's inventory under a relation back theory for after-acquired property.

¶ 51 Based upon the evidentiary materials, Spirit's financing statement for TSI's inventory, which includes after-acquired inventory, pre-dates any security interest Arvest could have acquired even *if* it had retained a secu-

rity interest following the sales of OAG's curtailed property, which we conclude it did not. Spirit's security interest has priority as the first in time, 12A O.S.2001 § 1–9–322,[16] and the proceeds from the Post–Litigation Cars were properly payable to it.

## CONCLUSION

¶ 52 The finding of the trial court that Spirit retained the right to seek an *in rem* judgment is affirmed. As to the relief granted in this controversy arising out of the operation of a luxury used car business by Arvest's debtor OAG and its relationship with a consignor, Spirit's debtor TSI, the trial court erred in failing to apply the law for the priority accorded depositary banks for recoupment or setoff by § 1–9–340. Accordingly, the award of proceeds traced by Spirit into a deposit account with Arvest which were attributable to sales prior to the appointment of a receiver, *i.e.*, the proceeds from sales of Pre–Litigations Cars, is reversed. As to the proceeds from sales conducted under court orders by the receiver,

*i.e.*, those of the Post–Litigation Cars, Spirit's security interest has priority over that of Arvest due to the earlier filing of a financing statement covering inventory and after-acquired inventory, and the award of any proceeds from those sales to Arvest must be reversed. The case is remanded to the trial court for entry of orders to effect the views expressed in this opinion.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

HANSEN, J., and JOPLIN, J., concur.

---

**16.** Because all the proceeds from the Post–Litigation Cars were generated by sales by the receiver conducted pursuant to court orders, we need not address an analysis of the effect under 12A O.S. 2001 § 1–9–315 of non-cash proceeds, such as cars acquired using proceeds from prior sales, which situation arose here only with regard to some Pre–Litigation Cars.